**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 94-60730
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROY C. BRADFIELD and
LEE ANDREW WILLIAMS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Mississippi

_____

May 14, 1997

Before POLITZ, Chief Judge, and WIENER and STEWART, Circuit Judges.

WIENER, Circuit Judge:

Following the filing and release of this panel's original opinion in the subject case,[1] a member in active service on this court asked that the mandate be held and that the panel reconsider its decision, urging, inter alia, that even if the panel remained convinced that its judgment is correct, a narrower opinion could produce the same result. Agreeing now with our colleague, we withdraw our original opinion and substitute in its place the writing that follows.

Defendants-Appellants Roy C. Bradfield and Lee Andrews

---

[1]United States v. Bradfield and Williams, 103 F.3d 1207 (5th Cir. 1997).

Williams appeal their convictions for conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§841(a)(1) and 846.  For the reasons set forth below, we affirm Williams' conviction but reverse Bradfield's and remand his case for a new trial.

I.

FACTS AND PROCEEDINGS

The events giving rise to Bradfield's and Williams' indictments and ultimate convictions arose in the context of a reverse-sting operation orchestrated largely by the FBI's confidential informant, John Lee Chancey, Jr.  The sting targeted Bradfield directly.

Bradfield is a forty-year-old truck driver from Benton, Mississippi.  On a trucking job in 1991, he met two other drivers, Chancey and Juan Guerero, for the first time.  While waiting for their trucks to be unloaded, Guerero and Chancey began talking about cocaine and weapons deals.  The only evidence in the record of this conversation is Chancey's testimony, from which it is not absolutely clear that Bradfield did not participate in the conversation but merely listened.  Chancey testified initially that Bradfield "was just laying aside . . . just hearing it."  The only evidence that any part of the conversation may have been directed at Bradfield is Chancey's subsequent testimony that he told Bradfield to call Guerero if he (Bradfield) wanted to do a deal but that Chancey would not do a deal until the current trucking job was completed.  Still, there is no evidence that Bradfield participated

in any dialogue with either Chancey or Guerero, and none dispute that Bradfield and Chancey made no agreement that day to do a deal or that Bradfield left without even bothering to get Chancey's telephone number.

Chancey testified further, over a defense objection to hearsay, that some three months later, in March 1992, Guerero called and said that he had been contacted by Bradfield about doing a deal with Chancey. According to Chancey, he immediately notified personnel at a Texas district attorney's office, and together they began to develop a plan to lure Bradfield to Texas to purchase drugs. The district attorney's office agreed to compensate Chancey with 15-25% of whatever money might ultimately be obtained in the drug deal. When the district attorney realized that his office did not have the manpower or the jurisdiction to carry out the plan, he called it off. Disappointed that he would not make any money, Chancey kept his venture alive by next contacting FBI personnel and persuading them to take the case on the same contingency fee arrangement. Chancey admitted at trial that if he had not persisted with the FBI, the reverse-sting operation would have died when the district attorney in Texas lost interest.

Chancey placed as many as eighteen telephone calls to Bradfield, who returned none, before Chancey finally induced Bradfield to discuss a deal. Indeed, following several telephone conversations, some of which were taped, Bradfield and Chancey twice attempted — unsuccessfully — to structure the drug deal in Mississippi. Finally, several weeks later, Chancey returned to

3

Jackson, Mississippi and, in a taped telephone conversation on June 22, 1992, made a deal to sell Bradfield four kilograms of cocaine for $50,000. They decided to meet at the Shoney's restaurant adjacent to the Shoney's Inn on East County Line Road where Chancey was staying.

That same day Williams, who is a mechanic, used auto parts dealer, and occasional roofing contractor from Yazoo County, Mississippi, agreed to ride to Jackson with his nephew, Herbert Watts, Jr., to pick up some furniture for delivery to Williams' sister-in-law, Joyce Sawyer, in Ridgeland, Mississippi. According to Watts' testimony, Williams and Watts rode in Watts' truck to East County Line Road and stopped at a convenience store to call Ms. Sawyer before picking up the furniture. She was not at home, so they decided to eat at the Shoney's restaurant next door.

Williams and Watts entered the restaurant with a relative of Roy Bradfield's, Newton "Shawn" Bradfield (Shawn), whom Williams had recognized in the parking lot. Once inside, Williams spotted his old high school classmates, Bradfield and co-defendant Gregory Robertson, sitting together at a table. Williams, Watts, and Shawn joined Bradfield and Robertson and ordered something to eat.

Around 1:00 p.m., Chancey entered the restaurant and sat at a table next to the aforenamed group of five. Shortly after Chancey sat down, Bradfield pointed to Williams, indicating to Chancey that Williams was "the man that was going to bring the money," and then motioned for Chancey to accompany him (Bradfield) to the men's room. Inside the men's room, Bradfield and Chancey engaged in a

**4**

lengthy conversation which Chancey was secretly recording. About fifteen minutes later, Williams entered the men's room and Bradfield introduced him by his nickname, Chimp, to Chancey. The conversation resumed, this time among the three men.

The gist of this recorded conversation was that some of the drug money was at the restaurant, but that a substantial amount was elsewhere. Bradfield said that he and Robertson would leave the restaurant, presumably to retrieve the rest of the money, and instructed Williams to tell Shawn that they (Williams and Shawn) would show Chancey the money that Shawn was holding. Bradfield also instructed Williams to accompany Chancey to his motel room and wait there with him until Bradfield returned with the rest of the money. Williams agreed to go with Chancey, saying that he would take along a "notebook or something."

Instead of going with Chancey, though, Williams went back to the table and got Watts. The two of them then left the restaurant together, leaving Robertson and Shawn at the table.

David Langlois, an FBI electronics technician, witnessed the next series of events, to which he testified at trial. Langlois was driving home from work and stopped at a Texaco station at Exit 108 on I-55. While stopped, he saw a dark Buick Regal, which matched a vehicle description that he had heard earlier on the FBI radio, turn into the service station across the street from the Texaco and stop alongside a silver Ford Ranger pickup belonging to Watts. One of the occupants of the Buick (Langlois testified that there were at least two) entered the service station's convenience

store, and the silver pickup was driven around to the rear of the store.  The individual from the Buick left the store and walked around to the silver pickup at the rear of the store.  Two individuals in the Buick then drove it away.  The driver of the silver pickup moved it to the east side of the station, parked it, got out, and got into a dark colored, full-sized pickup truck belonging to Robertson, who had just arrived at the service station.  The individual from the silver pickup and Robertson then left the station in Robertson's truck.

Langlois never saw gasoline purchased for any of the vehicles that had stopped at the station.  The FBI agents who observed the scene (Langlois and his relief) reported that the individuals in the various vehicles appeared to be engaged in "counter-surveillance" activity, i.e., looking for indications of any suspicious circumstances or the presence of law enforcement officers.

Not surprisingly, Williams' brief recounts a significantly different version of these events.  According to Williams' version, he and Watts left the restaurant and called Ms. Sawyer again, but she was still not home, so they drove to Williams' brother's house in Jackson.  Williams read the paper and dozed for about an hour while Watts continued the efforts to contact Ms. Sawyer.  Never able to reach her, the two headed back to Yazoo County, as Watts had to report to work in Canton, Mississippi at 3:30 p.m.  Watts stopped at a Texaco station at Exit 108 on I-55 and filled his truck with gasoline. Leaving the station, they saw Robertson

putting diesel fuel into his truck.  Watts stopped beside Robertson's truck, and Williams asked Robertson if he wanted to see a roof that Williams had put on a "mansion" in Madison County. Watts parked his truck; Watts and Williams got into Robertson's truck; and the three went to see the roof (despite Watts' purported appointment in Canton).  Later, when those three returned to the Texaco station in Robertson's truck, three cars of FBI and DEA agents pulled in behind them, detained them for approximately 25-30 minutes, photographed them, searched their persons as well as Robertson's and Watts' trucks, but eventually released all three without arresting them.

It is noteworthy that (1) Williams maintains that these events took place at the Texaco station at Exit 108 on I-55, but Langlois testified that they occurred at the service station across the street from the Texaco station, and (2) Langlois never saw fuel purchased for any of the vehicles.

Sometime after the vehicles left the service station, Bradfield went to Chancey's room at the Shoney's Inn where, during a video taped meeting, Bradfield chided Chancey for not coming to Exit 108 so that the transaction could proceed more smoothly. Chancey and Bradfield went downstairs and got into the Buick. Inside the car, co-defendant Michael Roberts showed Chancey one sack of money, and Bradfield pointed to another sack of money on the floorboard.  Chancey returned to his room alone, supposedly to get the drugs, whereupon Bradfield and Roberts were arrested in the Buick in possession of a 9mm machine pistol and $50,000.

Back at Exit 108, another FBI agent had observed Robertson drive into the same service station.  Williams was in the truck with Robertson, who stopped beside Watts' silver pickup.  Watts got out of his truck and into Robertson's.  As Robertson drove off with Williams and Watts, two FBI agents stopped Robertson's truck, identified the three individuals, photographed them, and — according to Williams' brief — searched their persons and the two trucks but released them without arrest.  No money or drugs were found on any of their persons or in their vehicles.

Bradfield was indicted by a federal grand jury, charged with conspiracy to possess with intent to distribute cocaine.[2]  He did not testify at trial but relied primarily on an entrapment defense.  The district court nevertheless refused to instruct the jury on entrapment.  Bradfield was convicted and sentenced to 135 months, to be followed by a four year period of supervised release, and was ordered to pay a $1,000 fine.

Bradfield timely appealed, asserting that the district court erred in: (1) failing to instruct the jury on entrapment, (2) failing to instruct the jury on evaluating the credibility of a compensated witness, and (3) denying a downward adjustment to Bradfield's sentence for acceptance of responsibility.

Williams was indicted by a federal grand jury, charged with conspiracy to possess with intent to distribute cocaine.  Williams did not testify at trial but relied primarily on a defense of

---

[2]Roberts and Robertson were also indicted and tried with Bradfield and Williams.

8

innocent presence and association.  He was convicted and sentenced to 97 months, to be followed by a four year period of supervised probation, and was ordered to pay a fine of $1,000.  Williams filed motions for a judgment of acquittal and a new trial, both of which were denied by the district court.

Williams timely appealed, asserting that (1) the evidence was insufficient to support his conviction, (2) the district court erroneously denied his motion for a new trial, (3) the district court denied his right to a speedy trial, (4) the district court's rulings were inconsistent, and (5) his counsel was ineffective.

II.

ANALYSIS

A. BRADFIELD

*1. Jury instruction on entrapment*

A defendant is entitled to an entrapment instruction when there is sufficient evidence from which a reasonable jury could find entrapment.[3]  It follows that when a defendant's properly requested entrapment instruction is undergirded by evidence sufficient to support a reasonable jury's finding of entrapment, the district court errs reversibly by not adequately charging the

---

[3]Matthews v. United States, 485 U.S. 58, 62, 108 S. Ct. 883, 886 (1988); United States v. Collins, 972 F.2d 1385, 1413 (5th Cir. 1992), cert. denied, 507 U.S. 1017, 113 S. Ct. 1812 (1993).  See also United States v. Branch, 91 F.3d 699, 711-12 (5th Cir. 1996)("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor . . . .")(citing Matthews, 485 U.S. at 63, 108 S. Ct. at 887).

jury on the theory of entrapment.[4] We review de novo the district court's refusal to offer a "theory of defense" requested by the defendant.[5]

The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with the government agents.[6] Thus the threshold question is whether the defendant was predisposed to commit the offense.[7] To assert an entrapment defense successfully, the defendant must first make out a prima facie case that the government's conduct created a substantial risk that an offense would be committed by a person other than one ready to commit it.[8] This requires the defendant to show both (1) his lack of predisposition to commit the offense and

---

[4]See United States v. Schmick, 904 F.2d 936, 943 (5th Cir. 1990), cert. denied sub nom., 498 U.S. 1067, 111 S. Ct. 782 (1991)("It has long been well established in this Circuit that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent.")(quoting United States v. Lewis, 592 F.2d 1282, 1285 (5th Cir. 1979)); United States v. Johnson, 872 F.2d 612, 622 (5th Cir. 1989)("When a defendant properly requests an instruction on a theory of defense that is supported by some evidence, it is reversible error not to adequately present the theory.").

[5]United States v. Gentry, 839 F.2d 1065, 1071 (5th Cir. 1988), cert. denied sub nom., 500 U.S. 925, 111 S. Ct. 2034 (1991).

[6]United States v. Pruneda-Gonzalez, 953 F.2d 190, 197 (5th Cir.), cert. denied, 504 U.S. 978, 112 S. Ct. 2952 (1992)(citing United States v. Nations, 764 F.2d 1073, 1079 (5th Cir. 1985)); United States v. Toro, 840 F.2d 1221, 1230 (5th Cir. 1988).

[7]United States v. Ivey, 949 F.2d 759, 768 (5th Cir. 1991), cert. denied sub nom., 506 U.S. 819, 113 S. Ct. 64 (1992).

[8]Johnson, 872 F.2d at 620; United States v. Hudson, 982 F.2d 160, 162 (5th Cir.), cert. denied, 510 U.S. 831, 114 S. Ct. 100 (1993).

(2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense.[9]

Before our decision in United States v. Nations,[10] it was unclear how much evidence of non-predisposition and inducement the defendant had to show before he becomes entitled to an entrapment instruction.[11] One line of decisions directed the trial judge to give an entrapment instruction if the defendant presented any evidence supporting his assertions, regardless of how flimsy or insubstantial his evidence might be.[12] An alternative view required the defendant to present substantial evidence, which was defined as more than just a smattering or a scintilla, before he could obtain an entrapment instruction.[13]

In Nations, we resolved these conflicting authorities, stating that the defendant must show evidence that provides, at the least, a basis for a reasonable doubt on the ultimate issue of whether criminal intent originated with the government. In short, the record must contain sufficient evidence of both inducement and lack

---

[9]Pruneda-Gonzalez, 953 F.2d at 197; United States v. Andrew, 666 F.2d 915, 922 (5th Cir. 1982); United States v. Leon, 679 F.2d 534, 538 (5th Cir. 1982); United States v. Fischel, 686 F.2d 1082, 1085 (5th Cir. 1982).

[10]764 F.2d 1073 (5th Cir. 1985).

[11]Nations, 764 F.2d at 1080; Fischel, 686 F.2d at 1086 n.2.

[12]See Perez v. United States, 297 F.2d 12 (5th Cir. 1961).

[13]See Pierce v. United States, 414 F.2d 163 (5th Cir.), cert. denied, 396 U.S. 960, 90 S. Ct. 435 (1969).

of predisposition to raise an entrapment issue; the entrapment issue need not be presented to the jury if the evidence does not raise the issue to that degree.[14]

The Supreme Court's holding in Matthews — that a defendant is entitled to an entrapment instruction when there is sufficient evidence from which a reasonable jury could find entrapment — comports with our pronouncement in Nations. Moreover, in the recent decision of United States v. Branch,[15] we rejected the scintilla of evidence standard, recognized that Matthews resolved the issue of the amount of evidence required, and reiterated the standard — that evidence in support of a defensive theory must be sufficient for a reasonable jury to rule in favor of the defendant on that theory.[16]

Predisposition focuses on whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the offense.[17] Specifically, the question is whether the defendant intended, was predisposed, or was willing to commit the offense before first being approached by government agents.[18] Government inducement

---

[14]Nations, 764 F.2d at 1080.

[15]91 F.3d 699, 712-13 (5th Cir. 1996).

[16]See also United States v. Stowell, 953 F.2d 188, 189 (5th Cir.), cert. denied, 503 U.S. 908, 112 S. Ct. 1269 (1992).

[17]Matthews, 485 U.S. at 63, 108 S. Ct. at 886 (citations omitted).

[18]Johnson, 872 F.2d at 620-21 (citing United States v. Yater, 756 F.2d 1058 (5th Cir.), cert. denied, 474 U.S. 901, 106 S. Ct. 225 (1985)).

consists of the creative activity of law enforcement officials in spurring an individual to crime.[19] It need not overpower the defendant's will. Neither does the entrapment defense require proof of threats or coercion.[20]

Evidence that government agents merely afforded the defendant an opportunity or the facilities for the commission of the crime is insufficient to warrant the entrapment instruction.[21] If, however, the defendant makes a prima facie showing of both elements — lack of predisposition and true inducement by the government — he is entitled to a jury instruction on the issue of entrapment.[22] At this juncture the burden shifts to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the offense prior to first being approached by government agents.[23]

Bradfield insists that the strong preponderance of the evidence adduced at trial demonstrates beyond serious question that the government, through Chancey's overly persistent efforts, induced Bradfield to commit an offense that he was not predisposed to commit, i.e., that the sheer number of contacts initiated by Chancey without response or encouragement from Bradfield before

---

[19]Fischel, 686 F.2d at 1085.

[20]Id.

[21]Matthews v. United States, 485 U.S. 58, 66, 108 S. Ct. 883, 888 (1988).

[22]United States v. Hudson, 982 F.2d 160, 162 (5th Cir.), cert. denied, 510 U.S. 831, 114 S. Ct. 100 (1993); Fischel, 686 F.2d at 1085; Leon, 679 F.2d at 538; Andrew, 666 F.2d at 922-23.

[23]Hudson, 982 F.2d at 162.

**13**

Bradfield finally succumbed to Chancey's ceaseless siren song demonstrates both absence of predisposition and substantial governmental coaxing. Thus, he argues, the district court erred in refusing to instruct the jury on entrapment. Bradfield emphasizes the following: (1) He met Chancey purely by coincidence on a trucking job and passively listened in on a conversation between Chancey and Guerero about guns and drugs; (2) Bradfield and Chancey did not plan a drug deal on the day that they met, and Bradfield left without attempting to get Chancey's phone number; (3) Chancey testified that the reverse-sting was his idea from the beginning and that only his initiative and persistence with the FBI kept the plan alive; (4) Chancey had a substantial contingency fee arrangement with the FBI, and he owed approximately $1,500 in child support; (5) Chancey admitted at trial that it was he who called Bradfield and told him to contact Guerero if he wanted to do a deal, not vice versa (and even then admitted subsequently that he had not talked to Bradfield but only to Bradfield's wife); and (6) Chancey bombarded Bradfield into submission with approximately eighteen calls during April 1992, in an unrelenting campaign to entice Bradfield to do a drug deal, before he finally succumbed and started to negotiate.

Predictably, the government counters that the evidence adduced at trial showed Bradfield's predisposition to commit the offense, thereby obviating the necessity for an entrapment instruction. First, the conversation between Bradfield, Chancey, and Guerero during the trucking job regarding the trading of guns for cocaine

**14**

demonstrated that Bradfield was a willing participant even before Chancey became a government informant. And it was Chancey who told Bradfield that he (Chancey) would not do a drug deal until the trucking job was completed.[24] Second, Chancey testified that Guerero had called him and said that Bradfield had contacted Guerero about doing a deal with Chancey. Third, the numerous recorded phone calls between Bradfield and Chancey revealed Bradfield's willingness to commit the offense. Finally, in a recorded face-to-face conversation, Bradfield confided in Chancey that he (Bradfield) was going to tell his friends who were supplying the drug money that their price was $15,000 per kilo when in actuality the price was $12,000 per kilo.

The government relies most heavily on Chancey's improperly admitted double hearsay testimony. Chancey testified that Guerero called him to say that Bradfield had contacted Guerero about doing a deal with Chancey. When Bradfield's counsel objected to the testimony, the district judge overruled her objection. On appeal, Bradfield again challenged the admissibility of the testimony. It is well established in this circuit that hearsay may not be introduced as evidence of predisposition;[25] therefore, Chancey's

---

[24]As noted earlier, it is less than pellucid from Chancey's testimony whether Bradfield actually participated in this conversation or merely listened in.

[25]United States v. Webster, 649 F.2d 346, 347 (5th Cir. 1981)(en banc). See also United States v. Kang, 934 F.2d 621, 626 (5th Cir. 1991). In United States v. Nixon, 777 F.2d 958, 964 (5th Cir. 1985), we clarified the holding in Webster: If an extrajudicial statement is otherwise admissible under the usual hearsay rules either as an exception or as non-hearsay, it may be admitted as evidence of predisposition. In the instant case,

testimony on this point cannot be considered. The district court abused its discretion in admitting this testimony, and we deem it excluded.

The government's protestations to the contrary notwithstanding, we conclude that Bradfield made a prima facie showing of non-predisposition and inducement, with sufficient evidence, under Matthews, upon which a reasonable jury could base a finding that Bradfield was entrapped. First, there is sufficient evidence that Bradfield was not disposed to commit the offense.[26] Once the hearsay testimony is disregarded, there is no question but that Bradfield made a prima facie showing of lack of predisposition. The record is devoid of evidence that Bradfield had ever shown an interest or willingness to participate in a drug deal before he met Chancey. And he continued to exhibit an absence of intent for quite a while, despite Chancey's persistent overtures. There is no evidence at all of even a passing interest by Bradfield prior to the lengthy period of Chancey's courtship on behalf of the government.

---

Chancey's testimony was neither an exception to the hearsay rule nor non-hearsay; therefore, it is inadmissible to prove Bradfield's predisposition. See also United States v. Miller, 799 F.2d 985, 991 (5th Cir. 1986).

[26]Bradfield's failure to testify is not fatal to his entrapment defense. In United States v. Henry, 749 F.2d 203 (5th Cir. 1984), rejected on other grounds by, United States v. Jones, 839 F.2d 1041 (5th Cir.), cert. denied, 486 U.S. 1024, 108 S. Ct. 1999 (1988), we stated that "[t]he defendant is not required to testify or to concede guilt in order to pursue the entrapment theory." Id. at 210. Thus Bradfield may rely on other evidence in the record to demonstrate his lack of predisposition. For example, Bradfield's employer of eight to ten years testified that Bradfield was a hard-working husband and father.

Second, the record contains a plethora of evidence of government inducement.[27] The reverse-sting operation was Chancey's idea, and he actively solicited the FBI's involvement in the plan. Well before Bradfield indicated any interest at all in a drug deal, Chancey made innumerable telephone calls to Bradfield to entice him to do a drug deal.  It was only through his own self-interested, persistent, and relentless efforts that Chancey was finally able to persuade Bradfield to participate in the drug deal.  We have recognized that "the time involved is less important than the degree of pressure applied."[28]  Furthermore, Chancey was driven, to the point of obsession, by the prospect of substantial monetary reward from his contingency fee agreement and was clearly motivated by his pressing financial obligations.

As the evidence was more than sufficient to establish a prima

_____

[27]As neither side introduced into evidence either the tapes or transcripts of the numerous recorded "courtship" calls that Chancey admittedly made to Bradfield before he finally decided to participate in the deal, we must infer that the content of those calls could neither have helped nor harmed either the government's case or Bradfield's.  As it is obvious from the rest of the record evidence, however, that Chancey repeatedly tried to tempt Bradfield before he finally accepted Chancey's invitation to deal, the only appropriate inference is that Bradfield rejected (or at least never responded affirmatively to) the myriad entreaties from Chancey which preceded Bradfield's eventual acceptance.  It follows that there is sufficient evidence and inferences of government inducement to mandate the entrapment instruction.  This same evidence distinguishes the instant case from United States v. Fischel, 686 F.2d 1082, 1086 (5th Cir. 1982), in which we found no error in the district court's refusal to instruct the jury on entrapment when the defendant had made but a single hesitation of acquiescence ("I can't get involved in this.") before he agreed to and did participate in the drug transaction.

[28]United States v. Sandoval, 20 F.3d 134, 138 n.13 (5th Cir. 1994).

**17**

facie showing of both Bradfield's lack of predisposition before first governmental contact and the government's protracted inducement efforts, we find unavoidable the conclusion that the district court's refusal to instruct the jury on entrapment constituted reversible error. We emphasize that we have <u>not</u> concluded that Bradfield was entrapped by the government —— only that he was entitled to the entrapment instruction. As we are also convinced that but for this error there is a substantial likelihood that the jury verdict might have been favorable to Bradfield, we do not engage in testing for harmlessness. To do so under these circumstances would be a hollow act.

*2. Bradfield's Other Assignments of Error*

Bradfield claims that the district court committed two additional errors. For the first time on appeal, he contends that the district court erred when it failed to instruct the jury specifically on evaluating the credibility of a government informant witness who is compensated pursuant to a contingency fee agreement. As we are reversing his conviction based on the court's refusal to give an entrapment instruction to the jury, we need not and therefore do not address Bradfield's assignment of error on this point.[29] Likewise, as we are vacating Bradfield's sentence,

---

[29]This issue is well developed in the jurisprudence of this court by our en banc opinion in <u>United States v. Cervantes-Pacheco</u>, 826 F.2d 310 (5th Cir. 1987)(en banc), <u>cert. denied sub nom.</u>, 484 U.S. 1026, 108 S. Ct. 749 (1988), and its progeny, e.g., <u>United States v. Rizk</u>, 833 F.2d 523 (5th Cir. 1987), <u>cert. denied</u>, 488 U.S. 832, 109 S. Ct. 90 (1988); <u>United States v. Kaufman</u>, 858 F.2d 994 (5th Cir. 1988), <u>cert. denied sub nom.</u>, 493 U.S. 895, 110 S. Ct. 245 (1989); <u>United States v. Goff</u>, 847 F.2d 149 (5th Cir.), <u>cert. denied sub nom.</u>, 488 U.S. 932, 109 S. Ct. 324 (1988); <u>United</u>

we need not and therefore do not address his claim of entitlement to a downward adjustment for acceptance of responsibility under United States Sentencing Guideline §3E1.1. He remains free, however, to re-urge his acceptance of responsibility if he should be convicted in the future —— whether by guilty plea or by the jury —— on the charges he faced here, or any of them.

B. WILLIAMS

*1. Sufficiency of the evidence; Motion for new trial*

In reviewing challenges to the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and decide whether a rational jury could have found that the government proved all of the elements of the offense beyond a reasonable doubt.[30] We resolve all inferences and credibility determinations in favor of the jury's verdict.[31]

To sustain a conviction for conspiracy to possess with the intent to distribute cocaine, the government must prove beyond a reasonable doubt that (1) a conspiracy existed, (2) the defendant knew of the conspiracy, and (3) the defendant voluntarily

---

States v. Pruneda-Gonzales, 953 F.2d 190 (5th Cir.), cert. denied, 504 U.S. 978, 112 S. Ct. 2952 (1992); and United States v. Bermea, 30 F.3d 1539 (5th Cir. 1994), cert. denied sub nom., __ U.S. __, 115 S. Ct. 1113 (1995).

[30]United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992)(citing Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469 (1942)); United States v. Castro, 15 F.3d 417, 419 (5th Cir.), cert. denied sub nom., 513 U.S. 841, 115 S. Ct. 127 (1994).

[31]Castro, 15 F.3d at 419.

participated in the conspiracy.[32]  The government need not prove the elements by direct evidence alone; their existence may be inferred from the "development and collocation of circumstances."[33]

That one's mere presence at the crime scene or close association with the conspirators, standing alone, will not support an inference of participation in the conspiracy is long and well established.[34]  We will not lightly infer a defendant's knowledge of and participation in a conspiracy,[35] and the government may not prove a conspiracy merely by presenting evidence that places the defendant in "a climate of activity that reeks of something foul."[36]

Williams claims that the evidence is insufficient to support his conviction, insisting that it does nothing more than establish his presence at the crime scene and his association with others who were participating in the illegal activity.[37]  Specifically, Williams maintains that the government's evidence shows only that

---

[32]Maltos, 985 F.2d at 746; United States v. Sacerio, 952 F.2d 860, 863 (5th Cir. 1992).

[33]Maltos, 985 F.2d at 746 (quoting United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982)).

[34]Maltos, 985 F.2d at 746; United States v. DeSimone, 660 F.2d 532, 537 (5th Cir. 1981), cert. denied sub nom., 455 U.S. 1027, 102 S. Ct. 1732 (1982); Sacerio, 952 F.2d at 863; United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988); United States v. Jackson, 700 F.2d 181, 185-86 (5th Cir.), cert. denied sub nom., 464 U.S. 842, 104 S. Ct. 139 (1983).

[35]Maltos, 985 F.2d at 747 (citing Jackson, 700 F.2d at 185).

[36]Maltos, 985 F.2d at 747 (citing United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982)).

[37]Williams does not dispute that a conspiracy existed — only that the evidence was insufficient to show beyond a reasonable doubt that he (1) knew of and (2) participated in the conspiracy.

he (1) was seen at the Shoney's restaurant with Bradfield, Robertson, Watts, and Shawn, (2) participated in a portion of the recorded conversation in the men's room with Bradfield and Chancey, and (3) together with Watts and Robertson, was detained at the service station, searched, and released without arrest.

Our review of the record leads us to conclude that the evidence adduced at trial and all reasonable inferences therefrom are sufficient, when viewed in the light most favorable to the verdict, to show beyond a reasonable doubt that Williams knew of and participated in the conspiracy. First, Chancey testified that, before going into the men's room, Bradfield pointed to Williams, indicating that he was the man who would bring the money. Second, Williams did not merely listen but participated at length in the recorded conversation in the men's room during which he, Chancey, and Bradfield discussed the exchange of the money for the cocaine. On this point, we have previously recognized that the knowledge and participation required for a conspiracy conviction may be inferred from evidence that the defendant was present during or participated in one or more pertinent conversations with others who were parties to a conspiracy.[38] Both the temporal and substantive extent of Williams' participation in the men's room conversation indicates

---

[38]See Jackson, 700 F.2d at 185 ("The government has offered no evidence indicating that [the defendant] was present during conversations in which the conspiracy was discussed.")(footnote omitted); Espinoza-Seanez, 862 F.2d at 538 ("[Defendant] was shown to have been with the conspirators in a car which they drove while making arrangements furthering their drug trafficking, but he was never shown to have heard any of the conversations or participated in any of them.")(referring to United States v. Gardea-Carrasco, 830 F.2d 41 (5th Cir. 1987)).

that his involvement was more substantial than mere presence or association. Finally, in the men's room conversation, Williams agreed to go to the motel with Chancey and wait for Bradfield to return with the rest of the money.

Viewed in the light most favorable to the jury's verdict, the evidence is sufficient to sustain Williams' conviction. It follows that the district court did not abuse its discretion in denying Williams' new trial motion grounded on an insufficiency of the evidence.[39]

*2. Speedy trial*

Williams maintains that the district court denied his right to a speedy trial. Whether a district court has complied with the Speedy Trial Act is a matter of law subject to our de novo review.[40] The Act requires that a defendant be tried within seventy non-excludable days of indictment; otherwise, the indictment shall be dismissed on motion of the defendant.[41] Nevertheless, the defendant's failure to move for dismissal prior to trial or entry of a plea of guilty or nolo contendre constitutes a waiver of the right to dismissal.[42] When Williams failed to raise the alleged

---

[39]United States v. Webster, 960 F.2d 1301, 1305 (5th Cir.), cert. denied sub nom., 506 U.S. 927, 113 S. Ct. 355 (1992)(reviewing district court's denial of a motion for a new trial for clear abuse of discretion).

[40]United States v. Jackson, 30 F.3d 572, 575 n.2 (5th Cir. 1994)(citing United States v. Taylor, 487 U.S. 326, 108 S. Ct. 2413 (1988)).

[41]18 U.S.C. § 3161(c)(1) (1994).

[42]18 U.S.C. § 3162(a)(2) (1994).

**22**

error prior to trial, he waived his right to dismissal under the Speedy Trial Act.

### 3. Inconsistent rulings by the district court

Williams posits that co-defendants to a conspiracy indictment must be treated alike;[43] consequently, he insists, the district court erred in denying his motion for a new trial after that court granted such a motion by Robertson. But Williams is wrong in his basic premise: Our precedent does not require identical treatment of co-defendants to a conspiracy indictment. It follows that Williams' claim is without merit.

### 4. Ineffective assistance of counsel

Finally, Williams contends that his counsel was ineffective in (1) waiving Williams' speedy trial rights without his consent, (2) subjecting Williams to public ridicule, scorn, and suspicion in his hometown as a result of his delayed detention, (3) failing to object timely to testimony implicating Williams in prior narcotics deals, and (4) conceding Williams' guilt in closing argument. Generally we shall not address a claim of ineffective assistance of counsel on direct appeal unless it has been raised before the district court. By way of exception, though, we shall review an ineffective assistance claim that was not previously raised to the

---

[43]Williams' argument misinterprets United States v. Sheikh, 654 F.2d 1057 (5th Cir. 1981), cert. denied, 455 U.S. 991, 102 S. Ct. 1617 (1982), and United States v. Zuniga-Salinas, 945 F.2d 1302 (5th Cir. 1991), both of which have been subsequently overruled and reversed, respectively, by United States v. Zuniga-Salinas, 952 F.2d 876 (5th Cir. 1992)(en banc)(holding that an inconsistent verdict is not a bar to conviction where all other co-conspirators are acquitted).

district court if the record is sufficiently developed with respect to the merits of such a claim.[44]  As Williams' claim was neither raised in the district court nor sufficiently developed in the record, we decline to address this alleged error on direct appeal.

### III.

### CONCLUSION

As the district court erred reversibly in refusing to instruct the jury on entrapment, we reverse Bradfield's conviction, vacate his sentence, and remand his case for a new trial.  As the district court committed no reversible error regarding Williams, however, his conviction is affirmed.

AFFIRMED as to Williams; REVERSED, VACATED, and REMANDED as to Bradfield.

---

[44]United States v. Tolliver, 61 F.3d 1189, 1222 (5th Cir. 1995)(citing United States v. McCaskey, 9 F.3d 368, 380 (5th Cir. 1993), cert. denied, 511 U.S. 1042, 114 S. Ct. 1565 (1994)).