# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 19, 2013

No. 12-30312

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

FREDERICK W. SMITH

Defendant-Appellant

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:10-CR-132-2

Before KING, SOUTHWICK, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Frederick W. Smith was convicted by a jury of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), of mail and wire fraud, and of the use of an interstate facility in aid of racketeering. On appeal, Smith argues that the district court erred in denying his request that the jury be instructed on the law of entrapment and that the government's evidence was insufficient to uphold his RICO conviction. We AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30312

FACTS

Frederick W. Smith is a former police chief of Port Allen, Louisiana. Beginning in 2007, the Federal Bureau of Investigation conducted an undercover operation directed at city officials in Louisiana. William Myles, a paid, cooperating witness, marketed to municipalities a fictitious waste container cleaning service called CIFER 5000. Essentially, Myles offered elected officials money or other bribes in return for their support of CIFER 5000.

The investigation initially targeted Mayor George L. Grace, Sr. of St. Gabriel, Louisiana. At some point, Grace told Myles that three other mayors would take official actions in exchange for bribes. One of these mayors was Derek A. Lewis, the mayor of Port Allen, who accepted tickets from Myles for a stadium suite valued at $8,500 to the Bayou Classic football game in exchange for his official support of CIFER 5000. After another official mentioned defendant Smith's name, Myles asked Lewis about his relationship with Smith and if Smith would be open to "doing a favor." Lewis said he and Smith were friends and Smith would likely perform "favors."

Later, Myles asked Lewis for confidential information on potential CIFER 5000 employees from the National Crime Information Center database ("NCIC"), which can only be accessed for legitimate criminal justice purposes. Lewis said he would ask Smith to get the information, and Myles provided Lewis with the individuals' names. In November 2009, Lewis relayed the names to Smith, explaining that the individuals were to be employed by a private entity, CIFER 5000. Smith responded to Lewis's request with "Absolutely, I'll take care of it." Smith obtained the information from the NCIC by falsely representing to the database providers that it was needed for criminal justice purposes. Smith then provided the information to Lewis who gave it to Myles. Smith received nothing in return for providing the information.

2

No. 12-30312

In January 2010, Myles talked to Lewis about arranging a meeting with Lewis, Myles, and Smith in New Orleans. Following this conversation, Lewis asked Smith whether he would be willing to obtain more confidential law enforcement information to take to Myles in New Orleans. Lewis told Smith that Myles would pay for the information. Lewis stated that, though they could not get paid directly for anything, Myles could give Smith a campaign contribution at election time. Smith responded, "Okay, no problem," and suggested "maybe when we go to New Orleans or want to get a get-away room or something like that." Lewis testified that after this conversation, his understanding was that Smith recognized he would be able to receive things from Myles in exchange for illegally obtained information. A few days later, Myles gave Smith more names to run through the NCIC, which Smith did.

Myles and Lewis discussed meeting Smith in New Orleans with the understanding that Myles would pay for everything. Smith expressed to Lewis a preference for eating at Drago's (a New Orleans restaurant) and spending the night in a hotel. Myles and Smith met in New Orleans; Smith gave Myles the confidential information. Myles paid for meals at Drago's and Ruth's Chris Steakhouse, paid for a night's stay at the Ritz Carlton Hotel, and gave Smith and Lewis $300 each. Smith responded to the payment: "This is beautiful."

When Smith gave Myles the confidential information in New Orleans, Smith explained that he would have to transfer the information to another sheet of paper because the original printout had his department's number. Such information, he stated, could be traced back to him, and Myles would be in trouble for possessing official documents without authority.

On January 19, 2010, Myles called Smith and asked whether he wanted to continue providing confidential information in exchange for money or favors. Smith responded, "Absolutely." Three days later, Smith called Myles to arrange

3

a time to exchange the requested information. Myles offered Smith basketball game tickets, an offer Smith accepted.

In February 2010, Myles asked Smith whether he had concerns about what they were doing, including discussing money over the phone. Smith said he wanted to continue. Smith told Myles he needed money to go to a casino that weekend. Myles agreed to reimburse him up to $1,000. A few days later, Myles asked Smith to send a letter to aid Myles's (fictitious) nephew who Myles said was facing drug charges in Connecticut. In return, Smith would receive $1,000 and basketball tickets. Smith got the money and tickets and later produced the letter, claiming a close relation with and vouching for the supposed nephew.

In March and April 2010, Smith informed Myles he could "fix tickets," run license plates, and provide police badges and commission cards. Smith provided Myles with an official Port Allen Police Department badge and commission card in exchange for $500. Smith further solicited Myles for any other names he could run through NCIC in exchange for "money for the weekend."

After being indicted by a grand jury, Smith was charged with violating RICO, mail and wire fraud, and using an interstate facility in aid of racketeering. Before his trial, Smith requested an entrapment instruction, and the United States requested the jury be instructed entrapment was not an issue. At the close of the United States' case-in-chief, Smith moved for an acquittal under Federal Rule of Criminal Procedure 29. The court denied the motion, and Smith renewed his motion at the close of the case. At the conclusion of the evidence, the court found Smith had not established a *prima facie* case of government inducement and lack of predisposition to justify a jury instruction on entrapment. The court instructed the jury that "entrapment is not an issue in this case and should not be considered by you." Smith objected to the instruction. The jury returned a guilty verdict on all counts.

No. 12-30312

DISCUSSION

Smith raises two issues on appeal. First, he argues the district court erred in denying his request that the jury receive an instruction on the law of entrapment. Second, he argues the government did not present sufficient evidence of his participation in the conduct of the enterprise's affairs through a pattern of racketeering activity as required for his RICO conviction.

## A.     *Entrapment Instruction*

Smith argues the evidence presented at trial was sufficient to establish a *prima facie* case that the government's conduct amounted to entrapment, and thus he was entitled to a jury instruction on the law of entrapment. We review *de novo* a district court's refusal to give a requested instruction on entrapment. *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997).

Entrapment is an affirmative defense requiring a showing of (1) "a lack of predisposition on the part of the defendant to engage in the criminal conduct" and (2) inducement by the government to commit the crime. *United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001). A defendant must establish these two elements to make a *prima facie* case that the government's conduct amounted to entrapment. *Bradfield*, 113 F.3d at 521. The government then bears the burden of proving beyond a reasonable doubt that the defendant was not entrapped. *Id.* at 522.

A defendant is entitled to a jury instruction on entrapment only if there is sufficient evidence of the two elements required to make out a *prima facie* case on the defense. *Id.* For the evidence to be sufficient, the defendant must show it "provides, at the least, a basis for a reasonable doubt on the ultimate issue of whether criminal intent originated with the government." *Id.*

Whether the defendant was predisposed to commit the offense is the threshold question. *Id.* at 521. The primary inquiry is whether the defendant "readily availed himself of the opportunity to perpetrate the offense." *Id.* at 522.

No. 12-30312

"[A] defendant's ready and willing participation in government-solicited criminal activity, standing alone, is sufficient to prove predisposition." *Reyes*, 239 F.3d at 739. In addition to the defendant's willing participation, courts examine other factors that tend to prove predisposition such as "desire for profit; demonstrated knowledge or experience with the criminal activity under investigation; the character of the defendant, including past criminal history; whether the government first suggested criminal activity; and the nature of the inducement offered by the government." *Id.*

Smith "readily availed himself of the opportunity to perpetrate the offense." *Bradfield*, 113 F.3d at 522. He responded with "absolutely" when Lewis asked whether he would illegally provide confidential information from NCIC for Myles. Whether Smith was brought into the scheme by Lewis or Myles (the government witness) is not important. *See United States v. Ogle*, 328 F.3d 182, 187 (5th Cir. 2003). It is true that Lewis, Smith's friend, initially approached Smith to provide the confidential information, and Smith asked for nothing in return. Nonetheless, when Lewis later mentioned compensation, Smith said he would like Myles to provide a "favor or a get-away room" in exchange for the information. Smith readily accepted the hotel room and meals in New Orleans and the first $300 payment from Myles.

Smith's "desire for profit" was evidenced by this and his later solicitations of money for gambling and his suggestions of other services he could provide, such as running license plates or obtaining police badges. *Reyes*, 239 F.3d at 739. Furthermore, Smith demonstrated his "knowledge or experience with the criminal activity under investigation" when he clarified that the confidential information could not have Port Allen letterhead on it because it could be traced back to him. Smith also detailed how Myles could fraudulently use the police badge and commission card Smith provided. Though there is no evidence that Smith previously engaged in criminal conduct, he made no effort "to disentangle

6

No. 12-30312

himself from the illegal activity." *See id.* at 740. Indeed, when asked whether he wanted to continue on this criminal course, Smith said, "absolutely." Smith insists that the fact he was not the original target of the investigation supports that he had no predisposition. We disagree. Lewis told Myles he had known Smith "all his life" and that Smith would be willing to get Myles confidential law enforcement information.

Smith contends that the only evidence of predisposition was that he readily accepted $300 from Myles after dinner in New Orleans. Smith says that payment was a government inducement. Predisposition must be independent of government intervention, not its product. *United States v. Bird*, 31 F.3d 1329, 1336 (5th Cir. 1994). Nonetheless, "[e]vidence of the defendant's ready response to the solicitation, as well as evidence of independently motivated behavior that occurs after government solicitation begins, can be used to prove that the defendant was predisposed." *Id.* Smith fails to show evidence that he lacked predisposition given his initial ready response to providing information, and his continued, enthusiastic involvement in illegal activity.

The second element of entrapment, government inducement, "consists of the creative activity of law enforcement officials in spurring an individual to crime." *Bradfield*, 113 F.3d at 522. It does not "require proof of threats or coercion," but there must be "some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the crime." *Id.* at 521-22. Persuasion, mild coercion, or pleas based on sympathy can constitute entrapment. *United States v. Theagene*, 565 F.3d 911, 922 (5th Cir. 2009). Inducement can also be shown by demonstrating that a defendant initially rejected overtures but eventually succumbed to a persistent government agent. *Bradfield*, 113 F.3d at 523 n.27, 524.

Smith cites to Myles's "wining and dining" him in New Orleans as evidence that the government induced him. He notes that he did not accept any

money until after the dinner. According to the indictment, the dinner in New Orleans, however, was a bribe, not an inducement. Smith specifically requested dinner at Drago's in exchange for providing confidential information. Smith does not point to any inducement prior to the New Orleans trip that would have led to his acceptance of those bribes.

Additionally, Smith relies heavily on *Theagene*, 565 F.3d at 924, where this court remanded an IRS bribery case based on the district court's refusal to give a jury instruction on entrapment. Smith contends the entrapment instruction in *Theagene* was required because "the talk about the bribe had been initiated by the IRS agent." While this was a factor in *Theagene*, the court found that a jury could conclude the unusual $500 cash payment to the IRS agent by Theagene was a means to demonstrate his good faith to pay down his taxes. *Id.* at 920. Additionally, Theagene testified that when the agent implied he wanted to keep the alleged bribery money, Theagene did not want to "get into a power struggle with someone [who] [could] make [his] life miserable." *Id.* at 921. Theagene also testified he felt "browbeaten" into agreeing to a meeting with the agent. *Id.* Moreover, the court pointed out that the agent "persisted in steering the conversation [towards bribery] despite resistance." *Id.* at 923. The court noted that the relationship between the IRS agent and Theagene was that of a government agent and a delinquent taxpayer. *Id.* Theagene did not have the option of walking away from the agent, and the court concluded the jury deserved a chance to evaluate whether the government's conduct was inducement. *Id.* at 922-23. Thus, the court's reasoning did not center on the IRS agent initiating a bribery conversation, but on Theagene's initial resistance, the imbalance of power, and his plausible alternate explanation that the payment was a demonstration of his good faith to pay down his taxes. *See id.* at 922-24.

Smith did not initiate the illegal activity. Nonetheless, this case is not comparable to *Theagene*. First, Smith's illegal behavior cannot be plausibly

explained as innocent, as could Theagene's $500 payment.  Second, Smith does not suggest he was "browbeaten" into illegally obtaining confidential information and accepting bribes or even that Myles had to "persist" to get Smith to illegally obtain information or accept bribes.  Smith did this without hesitation, and he has never argued that he felt pressured by the mayor.  Last, Smith had the option at any point to walk away from the criminal activity – this was not a relationship similar to that of an IRS agent and a delinquent taxpayer.  Indeed, he assured Myles he wanted to continue the illegal arrangement.

Though the request for illegal information and the offer of a bribe originated with the government, that conduct does not constitute inducement. "Simply because the chain of events leading to the defendant's arrest originated with the government does not entitle a defendant to an entrapment instruction." *United States v. Gutierrez*, 343 F.3d 415, 420 (5th Cir. 2003).  Smith's references to being "wined and dined" are insufficient to establish a reasonable doubt on the issue of whether he was induced by the government.  The record reveals no evidence of coercion, persuasion, persistence, or even appeals to Smith's sympathies or weaknesses. *Theagene*, 565 F.3d at 922 .  Therefore, Smith failed to produce sufficient evidence of either government inducement or lack of predisposition to commit the RICO violation, mail and wire fraud, and the crime of using of an interstate facility in aid of racketeering, and we find no error in the district court's refusal to instruct the jury on the entrapment defense.

B.    *RICO Conviction*

Smith also argues the government did not present sufficient evidence of his participation in the conduct of the enterprise's affairs through a pattern of racketeering activity as required for his RICO conviction.  Because Smith made a timely motion for judgment of acquittal, the sufficiency of the evidence is reviewed *de novo.  United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). Under this standard, the verdict will be affirmed "if a reasonable trier of fact

could conclude the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *Id.*

The RICO provision under which Smith was convicted prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To establish a violation under this provision, the government is required to prove "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was 'employed by' or 'associated with' the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a 'pattern of racketeering activity.'" *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005).

Smith argues the government failed to prove Smith was involved in an "enterprise" as required by the first element of the offense. Specifically, he argues CIFER 5000 was fictitious and cannot be characterized as an enterprise. This argument fails because CIFER 5000 was not the enterprise for the purpose of Smith's RICO conviction; the City of Port Allen is the enterprise with which Smith was "employed" or "associated." The indictment states, "the City of Port Allen, Louisiana constituted an 'enterprise' as defined by Title 18, United States Code, Section 1961(4) . . . . This enterprise engaged in, and its activities affected, interstate commerce."

An enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). It is "well-settled" that governmental agencies, departments, and entities are included in

this definition. *United States v. Stratton*, 649 F.2d 1066, 1074 (5th Cir. 1981). Therefore, Port Allen qualifies as an enterprise for the purposes of RICO.

Last, Smith argues that nothing in the record shows he was providing criminal histories with an intent to further the purported enterprise, CIFER 5000. To prove that a defendant participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, the government must show a nexus between the affairs of the enterprise and the pattern of racketeering activity. *United States v. Dozier*, 672 F.2d 531, 544 (5th Cir. 1982). This does not require that the enterprise had its affairs advanced by the pattern of racketeering activity, but rather that the government "prove that the predicate offenses and the affairs of the enterprise are related." *Id.*

The predicate offenses and the affairs of the City of Port Allen were related. The government was not required to show that Smith was furthering either CIFER 5000 or the City of Port Allen. The bribes accepted by Smith were in exchange for acts he was only able to perform because of his position as police chief of the City of Port Allen. This court has held that where the defendant's position enables him "to hawk its services for personal gain," the nexus is clearly established. *Id.* Thus, the government presented sufficient evidence to support Smith's RICO conviction.

AFFIRMED.