**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 15, 2009

Charles R. Fulbruge III
Clerk

No. 08-50160

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

SAMUEL M. THEAGENE,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

Before KING, DENNIS, and ELROD, Circuit Judges.

JENNIFER W. ELROD, Circuit Judge:

A jury convicted Dr. Samuel Theagene of one count of bribing a public official, 18 U.S.C. § 201(b)(1)(C), for making cash payments to an Internal Revenue Service revenue officer. The district court—calling the question "a close one"—denied Theagene's request for an entrapment instruction. Theagene now appeals the conviction, challenging the jury charge on this and other grounds. He also appeals his sentence. We hold that the evidence merited an entrapment instruction, and accordingly vacate the conviction and remand for a new trial.

# I. FACTS AND PROCEEDINGS[1]

From at least 2003 onward, Defendant-Appellant Theagene was delinquent in business and personal taxes. In 2004, IRS Revenue Officer Rick Geiger worked with Theagene to arrange an installment plan for back taxes of his business, a medical practice in San Antonio called the Pain & Neuromuscular Clinic of Texas, P.A.[2] Theagene made only one payment, however, and failed to pay newly accruing taxes. In 2006, the IRS sent Theagene demand letters for missing periodic reports, and for immediate payment of over $150,000 in business taxes, penalties, and interest. The letters instructed Theagene to call Geiger if he could not pay the amounts due.

After years of neglect, Theagene took action. He left a message for Geiger, and paid $14,863 toward the back taxes. He requested in writing that Geiger "abate . . . interest or penalties" because his clinic was experiencing "undue hardship." He wrote again, ascribed his business's delinquent taxes to "unfortunate oversight due to poor management," and stated that he had hired a payroll management company to rectify the problems. He enclosed two past-due returns and paid an additional $5,359.49, and again requested abatement of penalties and interest.

The IRS determined Theagene's response was inadequate. It denied abatement, and in September, 2006, Geiger began levying the Clinic's bank accounts and accounts receivable.

On October 3, 2006, in response to the levies, Theagene sent the IRS an unusual package. It was a manila envelope containing a letter and two smaller envelopes. Both the manila envelope and the letter were addressed to the IRS

---

[1] As discussed below, we view the facts in the light most favorable to Defendant-Appellant Theagene, as we are required to do.

[2] The business's exact structure is not clear from the record, but there is no dispute that Theagene was responsible for its taxes.

and specifically to Geiger. One of the smaller envelopes contained two checks, one voided and the other made out to the U.S. Treasury for $2000. Theagene's letter requested that the IRS lift the tax levies and place him on a new installment plan. It identified the $2,000 check as "representing the first installment," and the voided check as a source of bank account information for future automatic withdrawals. It also requested abatement of interest and penalties. The letter did not acknowledge or explain the second small envelope. That envelope was addressed to "Internal Revenue Service Mr. Rick Geiger." It contained $500 cash with a sticky note on which Theagene had written, simply, "a token." It is extraordinarily unusual for a taxpayer to send cash to the IRS.

The Treasury Department decided to investigate Theagene. Initially an IRS collections agent, Henry Amezquita, called about the $500. Theagene told Amezquita to apply the $500 to his tax account, and claimed he had not attached a sticky note to the cash. Amezquita had some doubts whether the cash was meant to be a bribe, but lead Treasury Department Criminal Investigator Victor Guevara considered it "an obvious bribe." Guevara determined to investigate further, with Geiger's assistance.

On October 5, 2006, Geiger telephoned Theagene. Geiger testified at trial that from his perspective, the purpose of the call was to determine whether Theagene meant to bribe him. Guevara recorded the conversation, and the prosecution played the recording for the jury. In the call, Theagene thanked Geiger for "calling back," and Geiger stated he "got [Theagene's] messages" but had been out of the office. Theagene offered excuses for his delinquency, expressed willingness to pay back taxes, and asked again about abating interest and penalties. Geiger informed Theagene of three possible ways to escape interest and penalties.

The conversation then proceeded as follows:

3

Geiger:      [. . .] Also, I'll send you the phone number and the, um, the, for the Taxpayer Advocates office.

Theagene:  Okay.

Geiger:      But what did you have in mind on how to—have me help you here?

Theagene:  Well, that's the . . . I guess, actually all I want is for the, uh, if the interest and penalties could go away we'd probably just keep paying the stuff and then get it behind us. 'Cause what I did is, I made sure that, uh, we brought in a company that's gonna take care of Payroll at once.[3]

Theagene then stated that he had fixed the problems leading to his delinquency, and that his medical practice was profitable enough to pay his back taxes, but that "with levies in place we cannot function to pay debts at all, be it IRS or anybody else's debts." He argued again for lifting the levies and allowing him to pay installments:

Theagene:  So, if that can be put in place, then, um, I don't see . . . I don't know if it's gonna be automatic . . . I don't see how we can default on this.

Geiger:      Well, I really wanna help you here.

Theagene:  Okay.

Geiger:      Okay, but, you know, we have our procedures here that I have to follow.

Theagene:  Okay.

Geiger:      You know, and so, um, the fact that the installment agreement did default, um, . . . but tell me what to do.

---

[3] In all quotations from transcripts, unbracketed ellipses are from the original as indicators of pauses in conversation.

Theagene: Well, um, can you release all levies?

Geiger: Well yeah, I can release 'em, yeah.

Theagene: Okay. And, um, that done then, um, we're going to start making payments.

Geiger: I mean, you mean like to reinstate the installment agreement?

Theagene: Uh, yes sir.

Geiger: [sic] On there. Okay. Well, like I'm still reviewing the file here and then, like I said, we've got the check for the two thousand. And let me ask you again, I may have asked you this already. Do you think it's gonna clear?

Theagene: [Y]es— . . . [Theagene explains that he postdated the check for October 15, and the funds would be available on that date. He proposes automatic withdrawals on the 15th of every month thereafter].

Geiger: Okay, well, let me ask you this. Did the . . . I'm kinda still going through the file and, yeah, the, uh, I'm trying to get caught up with everything here. We got the check. Now there was . . . there was also cash sent. Okay?

Theagene: Right.

Geiger: Som'em like $500.

Theagene: Right. Right.

Geiger: Was that for me or the account or what?

Theagene: Well, I, I, I, I really didn't . . . there is this . . . the bottom part of the, uh,—

Geiger: I wanna help you here, but you know, I need—

5

Theagene: No, I—

Geiger: Talk to me.

Theagene: Yeah, I understand that. Um, the bottom part of the, uh, of the levy is where it says, uh, there is a $308, which I'm not quite sure what . . . that's just interest and it's not . . . it's not money owed. And, um, what I was wondering if that could be applied towards that and, and, and, you know, just get that small part out of the way. I mean, I'm trying to get caught up as much as possible here with this—.

Geiger and Theagene briefly discussed the $308, and then Geiger asked about the note saying "a token":

Theagene: I really don't know what that is. And the reason—

Geiger: That's for me? or what?

Theagene: (Chuckle) Well let me . . . the reason why that went out the way it did is, is because a certain part of the . . . uh, I guess once I received, uh, letters with levies and all that happening, the concern became [sic] Well if you sent checks out, what if those checks, now they'll start bouncing left and right. So, I sent in a check to start the installment agreement and at the same time showing good faith that, um, we'll start getting some of the things behind us with, uh, with actual cash that will not go through bouncing—go through any bank or what have you.

At trial, Geiger conceded on cross examination that he began the telephone conversation suspecting bribery, but that by approximately this point in the conversation he "started thinking it was not a bribe." The conversation continued as follows:

Geiger: Okay, so the . . . what we did on the cash now, . . . like I said, I'm still kinda getting caught up here going

through the file, but that's gonna be applied to the account [—]

Theagene: Okay. Okay.

Geiger: [—] cash but, but again, I'm just a little confused on there was a note that was attached to it that says "Token."

Theagene: Hmm.

Finally, Geiger put the bribery question directly to Theagene:

Geiger: And . . . and I . . . well, I thought it was for me, to be honest with you.

Theagene: (Laughs) Well, . . . well, we, we, we could meet. We could meet and we could sit down and we could talk about . . . I don't know, but, but, um, I really want this thing behind me.

Geiger: Yeah, sure, we can meet.

Theagene proposed to meet at his own office, but Geiger asked to meet in a restaurant. Geiger closed the telephone conversation by stating: "Tell you what, on the cash, I'm gonna go ahead and just keep the money for now and not apply it to your account." Theagene responded: "[o]kay."

At the restaurant, Theagene broke the ice as follows:[4]

Theagene: I made an attempt the other day. I sent the $500. And really, I just want to know what it will take to get this thing behind me[.] To zero it out.

Geiger: The whole thing?

Theagene: Yes.

_____

[4] This conversation also was recorded.

7

During the conversation at the restaurant, Theagene explained his prior instructions (to Amezquita) to credit the $500 to his tax account: "[N]ot knowing the nature of what the call was really regarding, I didn't wanna get myself into trouble or anybody else." Geiger asked "is this between you and me then, from here on out [?]" Theagene responded that "I have come partially prepared . . . to see, what it is that will get this thing out of my way . . . between you and myself." Geiger calculated the business tax debt at over $160,000 and emphasized that "that's a good chunk." Theagene responded that "I'm offering 10 percent [. . .] directed to you, that's it. Will that do it?" Thereafter, Theagene met Geiger in restaurants on multiple occasions, and made cash payments totaling $16,000. Geiger, in turn, promised to lift the levies on Theagene's accounts and eliminate his business and personal tax delinquencies.

Theagene was indicted and tried on one count of bribery of a public official in violation of 18 U.S.C. § 201(b)(1)(C). At trial, Theagene's counsel based his defense strategy in large part on entrapment, but the court did not instruct the jury on the defense. Counsel submitted a proposed entrapment instruction prior to trial, and explained to the jury in the opening statement that Theagene would rely on this defense. He vigorously cross-examined Geiger and Guevara over whether they had manipulated and entrapped Theagene. The district court noted that "[t]his is going to be a close one . . .", and that counsel for Theagene "did a very good job" arguing entrapment. Nonetheless, it rejected Theagene's request for an entrapment instruction.[5] Theagene's counsel renewed the request, arguing that denying the instruction was tantamount to instructing the jury to find guilt, but the court charged the jury without mention of entrapment. The government told the jury in closing that "[t]here is no issue of entrapment in this case."

---

[5] It is undisputed that Theagene properly requested an entrapment instruction and preserved error.

After deliberating a short while, the jury sent a note asking the court to "[d]efine entrapment, how it would apply to this case." Theagene renewed his objection to charging the jury without an entrapment instruction, but the district court replied to the jury that "entrapment has not been submitted to you," and that the jury "should not be concerned with the issue of entrapment."

The jury convicted Theagene, and the district court sentenced him to a 97 month prison term plus three years of supervised release and a $100 assessment.

## II. STANDARD OF REVIEW

We review *de novo* a district court's refusal to offer an instruction for a criminal defense that, if credited, would preclude a guilty verdict. *See United States v. Gutierrez*, 343 F.3d 415, 419 (5th Cir. 2003); *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997).

Ordinarily when reviewing a criminal conviction, we view the evidence, and draw reasonable inferences, in the light most favorable to the verdict. *E.g.*, *United States v. Hall*, 500 F.3d 439, 442 (5th Cir. 2007). The evidence is sufficient to support a finding of guilt if a rational trier of fact *could have* found that the evidence established the elements of the offense beyond a reasonable doubt. *Id*.

We take the opposite approach, however, when reviewing a district court's refusal to instruct on a defense. As with any exculpating defense, the defendant is entitled to an entrapment instruction if he presents "evidence sufficient to support a reasonable jury's finding of entrapment." *Gutierrez*, 343 F.3d at 419; *accord Matthews v. United States*, 485 U.S. 58, 63 (1988). The question is whether the defendant identified or produced "evidence from which a reasonable jury *could* derive a reasonable doubt as to the origin of criminal intent and, thus, entrapment." *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985).

Accordingly, we construe the evidence and make inferences in the light most favorable to the defendant.

When there is evidence sufficient to support a reasonable jury's finding of entrapment, the district court's refusal of a properly requested entrapment instruction constitutes reversible error. *Gutierrez*, 343 F.3d at 419.

## III. DISCUSSION

"The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with government agents." *Bradfield*, 113 F.3d at 521. Entrapment occurs when the government causes an offense to be "committed by a person other than one ready to commit it." *Id.* The government may not "implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992).

Entrapment operates through a burden shifting regime. The defendant must first "make out a prima facie case that the government's conduct created a substantial risk" of entrapment. *Bradfield*, 113 F.3d at 521. This requires the defendant to make a prima facie showing of (1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense. *Id.* at 521. He can do so "by identification or production of evidence." *Nations*, 764 F.2d at 1080. A defendant who meets this burden is entitled to an entrapment instruction, whereupon the burden shifts to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the offense before the government first approached him. *Bradfield*, 113 F.3d at 521–22; *see also Jacobson*, 503 U.S. at 548–49; *United States v. Rodriguez*, 43 F.3d 117, 126 (5th Cir. 1995). "The question of entrapment is

generally one for the jury, rather than for the court." *Matthews*, 485 U.S. at 63 (citing *Sherman v. United States*, 356 U.S. 369, 377 (1958)).[6]

The measure of sufficiency for the prima facie showing is whether the evidence of inducement and lack of predisposition, considered together, is sufficient to permit a reasonable jury to find entrapment. *Bradfield*, 113 F.3d at 521–22; *Nations*, 764 F.2d at 1079–80. Inducement and predisposition are "related elements." *Matthews*, 485 U.S. at 63. We have also described them as "factors." *See, e.g.*, *United States v. Mora*, 994 F.2d 1129, 1137 (5th Cir. 1993). Evidence of each factor bears on the question "whether criminal intent originated with the defendant or with government agents." *Bradfield*, 113 F.3d at 521. It is therefore possible to describe the ultimate inquiry in two ways, focusing either on the defendant or the government. *Compare, e.g., Nations*, 764 F.2d at 1079 ("The ultimate issue in an entrapment case is proof beyond a reasonable doubt of predisposition.") *with id.* at 1080 ("[T]he ultimate jury entrapment issue [is] whether criminal intent originated with the government."). Our cases require "some showing" of each element. *Id.* at 1079; *see also United States v. Smith*, 481 F.3d 259, 263 (5th Cir. 2007) (holding entrapment instruction unnecessary where defendant "proffered no evidence of his lack of predisposition" and only complained of government misconduct); *Gutierrez*, 343 F.3d at 419–20 (holding entrapment instruction unnecessary, without discussion of predisposition prong, where defendant failed to show inducement). In practice, however, consideration of the two factors often overlaps. *See, e.g.*,

---

[6] The district court concluded, and the government now argues, that an entrapment instruction is only available in "unique and compelling circumstances." This formulation appears to derive from a dissenting opinion in the Fourth Circuit. *See United States v. Sligh*, 142 F.3d 761, 767 (4th Cir. 1998) (Phillips, J., dissenting) ("[T]he federal courts have in general found a basis for allowing an entrapment issue to go to the jury only in unique and compelling situations."). This is a problematic formulation to the extent it suggests that a trial court should withhold the instruction from the jury absent evidence that the trial judge finds "compelling." If the evidence would permit a reasonable jury to find entrapment, the question belongs to the jury.

*Gutierrez*, 343 F.3d at 421 (addressing only the inducement prong, but also citing the lack of "evidence of his hesitation to join the scheme," which is often considered an aspect of predisposition); *cf. Nations*, 764 F.2d at 1079 ("In earlier decisions . . . we merged 'inducement' and 'predisposition' by analyzing government inducement in terms of such obvious predisposition factors as a defendant's eagerness or reluctance to join in the charge criminal conduct."). As summarized in *Bradfield*, a court assessing the availability of the entrapment defense must consider whether the record contains "sufficient evidence of both inducement and lack of predisposition," but the two prongs ultimately go to the same showing: "the defendant must show evidence that provides, at the least, a basis for a reasonable doubt on the ultimate issue of whether criminal intent originated with the government" as opposed to the defendant. *Bradfield*, 113 F.3d at 521.

The record in this case would permit a reasonable jury to conclude that Theagene was *not* entrapped, based on evidence of "active, enthusiastic participation" in the crime once the restaurant meetings began. *Cf. Rodriguez*, 43 F.3d at 126–27. We view the evidence in the light most favorable to Theagene, however, and decide the separate question whether there is enough evidence in the record, with respect to predisposition and inducement, for a reasonable jury to find he *was* entrapped. We conclude that there is.

A. **Theagene's Predisposition**

Predisposition focuses on whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime. *Matthews*, 485 U.S. at 63 (quoting *Sherman*, 356 U.S. at 372). "Specifically, the question is whether the defendant intended, was predisposed, or was willing to commit the offense *before first being approached by government agents*." *Bradfield*, 113 F.3d at 522 (citing *United States v. Johnson*, 872 F.2d 612, 620–21 (5th Cir. 1989)).

12

Evidence of predisposition can include, for example, active, enthusiastic participation or demonstrated expertise in the criminal endeavor. In *Ogle v. United States*, for example, we held the defendant was not entitled to submission of an entrapment defense, where he was "a keen participant in [a money-laundering] conspiracy." 328 F.3d 182, 185–86 (5th Cir. 2003). Defendant Ogle claimed that a government informant entrapped him, but Ogle had arrived at a meeting with the informant fully prepared to discuss options for money-laundering. *Id.* at 186. This preparation demonstrated both expertise and enthusiasm, and Ogle failed to demonstrate "any hint of hesitation or unwillingness to enter into the conspiracy." *Id.*; *see also United States v. Ivey*, 949 F.2d 759, 768 (5th Cir. 1991) (holding that entrapment instruction was unnecessary, in light of the defendants' demonstrated expertise in, and enthusiasm for, trafficking in hides of protected animals).

A lack of predisposition can appear from, for example, lack of prior interest or experience related to the crime, significant hesitation or unwillingness, or attempts to return discussion to lawful conduct. In *Bradfield*, a government informant importuned defendant Bradfield approximately eighteen times to participate with him in a drug deal, before Bradfield finally acquiesced. 113 F.3d at 523. There was no evidence that Bradfield "had ever shown an interest or willingness to participate in a drug deal before he met [the government informant]." *Id.* at 523. We held that Bradfield made a prima facie showing of non-predisposition. *Id.* Similar reasoning led the Fourth Circuit to vacate a conviction and remand for retrial with an entrapment instruction, in a case with facts similar in some ways to the present case. In *United States v. Sligh*, 142 F.3d 761 (4th Cir. 1998), an IRS agent, after attending a bribery awareness course, became convinced that a taxpayer who had called her several times intended to bribe her. *Id.* at 764. Through multiple conversations and ultimately in-person meetings, the taxpayer "never made . . . an overture [of

13

bribery] and in fact . . . ignored [the agent's] multiple suggestions of wrongdoing and her initial suggestions of a bribe." *See id*. at 766–67. Nonetheless, the agent persisted until the taxpayer finally bribed her. *Id*. The Fourth Circuit, applying a "more than a scintilla of evidence" standard, held there was evidence the IRS had "implanted the bribery scheme in a mind that had never contemplated bribery," and that an entrapment instruction was appropriate. *Id*. at 762, 767.

We reject the government's central argument on predisposition, namely that Theagene's $500 "token" was *on its face* "an obvious bribe," thereby conclusively establishing predisposition prior to the phone call with Geiger. Government witnesses testified that they immediately suspected bribery because it was unheard of for a taxpayer to make legitimate payments in cash through the mail. But the unusualness of sending cash does not conclusively demonstrate bribery—the testimony also indicated it was unheard of for a taxpayer to attempt bribery by mailing cash to the IRS. Accordingly, viewing the evidence in the light most favorable to Theagene, a reasonable jury could conclude that the unusual cash payment did not by itself demonstrate predisposition.

The remainder of the evidence, viewed in the light most favorable to Theagene, likewise could support a lack of predisposition. Theagene testified that inept office managers caused him to fall behind in his taxes, and that he got further behind when he took time off to care for his sick brother. In response to IRS demand letters, he paid nearly $20,000 in taxes in August 2006, reportedly from proceeds of a cashed out life insurance policy. Thereafter, the IRS levied his bank accounts and accounts receivable. He testified that the levies interfered with the daily operation of his medical practice, and made it impossible for him to earn money in order to pay the remainder of his overdue taxes. In calls and letters to Geiger, he maintained that if the IRS would lift the

levies, he could pay his taxes. He testified that when he prepared the letter with the postdated check, the voided check for automatic deductions, and his request to abate penalties and interest, he was concerned because the levies made his bank accounts unreliable. According to his testimony, he took $500 cash from his office safe, "impromptu," and sent that in as well as a means to demonstrate good faith. He testified that he labeled the cash "a token" to acknowledge it was "a nominal fee towards this large amount of money," but later forgot he had written that note. According to Theagene, it was not meant as a bribe. When Amezquita called, Theagene told him to apply the cash to his account. In Theagene's version of the facts, when Geiger then called and repeatedly pressed him about the $500, Theagene felt browbeaten and agreed to a meeting. He testified that he let Geiger keep the $500 because "I'm not going to get into a power struggle with someone that can make my life miserable . . . I thought, well, if he wants $500 that badly, he might as well just go ahead and keep the money."

Geiger's testimony lends some support to Theagene's version of events. Geiger began the October 5, 2006 phone call believing that Theagene intended bribery. But after Theagene passed up opportunities to turn the discussion to bribery—even when Geiger said "[t]hat's for me? Or what?"—Geiger began to doubt that Theagene intended bribery. Geiger's cross examination included the following exchange:

> Counsel: Every time you asked the doctor about the $500, in your mind, you knew it was an obvious bribe, right?
>
> Geiger: I perceived it to be a bribe, yes.
>
> Counsel: Well, if it was an obvious bribe, at what point did you say to yourself, "Well, maybe this isn't a bribe. I keep asking him if it's a bribe and he keeps telling me no"? At what point do you get it in your mind that maybe it's not a bribe?

Geiger:     That was on page 8.

            [. . .]

Counsel:    And you started thinking it was not a bribe?

Geiger:     That's right.  At the very [. . .] bottom, sure.

Counsel:    So, now, we're at a point where you don't think it's a bribe?

Geiger:     Right.

            [. . .]

Counsel:    [W]hy did you change your mind about applying the money to his account?

Geiger:     Because when I told him that I thought—honestly, I thought it was for me, he changed his tune and now he wants to meet and discuss this further.

This testimony is highly relevant to predisposition.  We have determined that the $500 envelope did not, by itself, conclusively establish predisposition to bribe.  Yet even Geiger, who began the call believing the $500 was a bribery attempt, came to doubt it was as the call progressed.  It was not until *after* Geiger announced his own interpretation of the $500 as a bribe that Theagene suggested they meet.  Predisposition turns on "whether the defendant intended, was predisposed, or was willing to commit the offense *before first being approached by government agents.*"  *Bradfield*, 113 F.3d at 522 (citation omitted).  A reasonable jury could agree with Geiger's reaction during the October 5, 2006 telephone call, and conclude that the call is some evidence against predisposition.

There are certainly grounds to doubt Theagene's version of events.[7] Nonetheless, his story is plausible enough that the jury deserved a chance to evaluate it. The sending of the $500 envelope is, by itself, not conclusive as to predisposition, and the October 5, 2006 phone call arguably suggests there was none. In these circumstances, the predisposition analysis favors allowing a jury to determine whether bribery was on Theagene's mind before Geiger suggested it.

**B.    Government inducement**

"Government inducement consists of the creative activity of law enforcement officials in spurring an individual to crime." *Gutierrez*, 343 F.3d at 420 (quoting *Bradfield*, 113 F.3d at 522). It does not constitute entrapment for government agents to merely conduct undercover operations or otherwise employ "artifice and stratagem" to catch criminals. *See Ogle*, 328 F.3d at 185 (citing *Jacobson*, 503 U.S. at 548). Nonetheless, courts have identified inducement when government agents harass or threaten a defendant, or take "actions designed specifically to take advantage of the defendant's weaknesses." *See Gutierrez*, 343 F.3d at 420. Inducement appears where there is "some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense." *Bradfield*, 113 F.3d at 521.

---

[7] The most significant evidence suggesting predisposition is Theagene's delivery of further cash payments in the restaurant meetings, and his backward-looking statements arguably espousing a previous intent to bribe. Theagene's purported lack of memory regarding the "token" sticky note calls into question either his memory or his honesty, but is not so implausible as to compel a finding of guilt rather than entrapment. There were other credibility problems as well. Character and reputation witnesses testified disparagingly regarding Theagene's honesty, and his trial strategy apart from entrapment—claiming he thought the restaurant payments were legitimate all along—was implausible enough to the district court that Theagene received a perjury enhancement at sentencing. *Cf. United States v. Matthews*, 485 U.S. 58, 68 (1988) (Scalia, J., concurring in the judgment) (recognizing that a defendant may simultaneously assert entrapment and innocence, but noting that such a strategy can harm credibility).

"[P]ersuasion or mild coercion" and "pleas based on need, sympathy, or friendship" can constitute sufficient inducement to permit jury consideration of entrapment. *Nations*, 764 F.2d at 1080 (quoting *United States v. Jackson*, 700 F.2d 181, 191 (5th Cir. 1983)). In *Nations*, the defendant acceded to pleas from his former brother-in-law to transport stolen vehicles. The brother-in-law, who was working as an informant, appealed to Nations with "a tale of financial woes, the need to support a new spouse, and terminal cancer, all the while knowing that Nations' sister recently had died of cancer." 764 F.2d at 1080. We held that this inducement, combined with evidence of a lack of predisposition, was "ample to raise the entrapment defense." *Id.* at 1081.

Inducement can also appear when government agents persist in encouraging criminality after a defendant rejects overtures. In *Jacobson*, government agents repeatedly sent the defendant personalized correspondence and fake advertisements to encourage him to order child pornography materials. 503 U.S. at 546–47. Initially, the defendant solely expressed interest in adult pornography, but after two years of propositions, he placed an order for child pornography. The government argued that he was predisposed to commit the crime, but "[did] not dispute that it induced petitioner to commit the crime." 503 U.S. at 549 n.2. In *Bradfield*, police paid an informant a contingency fee to successfully induce Bradfield to participate in a drug deal. 113 F.3d at 518, 523. The informant made "approximately eighteen calls during April 1992, in an unrelenting campaign to entice Bradfield to do a drug deal." *Id.* at 523. We concluded that there was "a plethora of evidence of government inducement" and "more than sufficient to establish a prima facie showing." *Id.* at 523–24.

This court held that a defendant was not entitled to an entrapment instruction, for want of inducement evidence, in *Gutierrez*. Gutierrez, a policeman, accepted the invitation of a corrupt superior to help facilitate drug transactions in exchange for money. 343 F.3d at 417–18. The superior had

unknowingly been set up by police. Gutierrez asserted that he participated in the scheme because he feared the corrupt superior. *Id*. at 421. Assuming arguendo that the superior's conduct could constitute inducement by the government, we rejected Gutierrez's argument. *Id*. The asserted fear was "unsupported by any suggestion that [the superior] ever threatened him, harassed him, or manipulated his personal weaknesses to convince Gutierrez to join the conspiracy." *Id*. Rather, the superior was an "academy buddy" who simply asked Gutierrez to participate, and Gutierrez presented no evidence of hesitation to join the scheme. *Id*. at 417, 421.

Considering this authority and the governing standards, we conclude that Theagene made an adequate showing of inducement. We base this conclusion particularly on the October 5, 2006 phone call, in light of the relationship between Geiger and Theagene as government agent and delinquent taxpayer.

During the phone call, interpreted in the light most favorable to Theagene, Geiger moved the discussion to bribery, and persisted in steering the conversation that way despite resistance. Geiger telephoned Theagene for the purpose of suggesting his openness to bribery after Theagene told another IRS agent to apply the $500 cash in a legitimate way. Theagene said several times to apply the $500 to his tax account before agreeing to let Geiger keep the money for himself. Over the course of the phone call, Theagene proposed a specific, legitimate plan for paying his taxes, and repeatedly returned to the details of his proposal. Meanwhile, Geiger opened the door for bribery: "but what did you have in mind on how to—have me help you here?" / "Well, I really wanna help you here" / "there was also cash sent [. . .] [w]as that for me or the account or what?" / "I wanna help you here [. . . .] Talk to me." / "[A] token [. . .] That's for me? Or what?" Theagene responded with increasing awkwardness to these statements, but did not suggest bribery. It was not until Geiger stated that *he* interpreted the $500 as a bribe that Theagene suggested they meet.

19

Admittedly, all this persistence took place in a single conversation, in contrast to the many contacts in *Jacobson* and *Bradfield*. But the inducement in each of those cases was more than was necessary to merit an instruction,[8] and this case presents an additional factor not present in those cases. That factor is the unique pre-existing and ongoing relationship between Geiger and Theagene. A hesitant target of a sting can often walk away (literally or figuratively) from a potential inducer. This is implicitly what we expected of Gutierrez, for example, when we held that his unsupported subjective fears provided inadequate evidence of inducement. *See* 343 F.3d at 421. Theagene, however, had to deal with Geiger, because the IRS instructed him to go through Geiger if he wished to avoid the levies that shackled his business. Theagene testified that he let Geiger keep the $500 because "I'm not going to get into a power struggle with someone that can make my life miserable . . . I thought, well, if he wants $500 that badly, he might as well just go ahead and keep the money." Interpreting the facts in the light most favorable to Theagene, there was some evidence that even if Theagene lacked predisposition to bribe, it would have been risky and awkward for him to end the conversation, or otherwise resist, when Geiger stated that "well, I thought it was for me, to be honest with you," and that "on the cash, I'm gonna go ahead and just keep the money for now and not apply it to your account." In light of all the evidence, the government inducement analysis favors allowing a jury to determine whether Theagene was entrapped.

## C.     Reversible error

Having concluded that Theagene made an adequate showing of both lack of predisposition and government inducement, we also conclude that the

---

[8] As discussed above, the government in *Jacobson* conceded inducement, and this court in *Bradfield* held that the evidence of inducement was "more than sufficient to establish a prima facie showing." *Jacobson*, 503 U.S. at 549 n.2; *Bradfield*, 113 F.3d at 523–24.

evidence could raise a reasonable doubt on entrapment. *Cf. Nations*, 764 F.2d at 1079 ("[A]lthough we concluded that a reasonable jury *would not necessarily have had* a reasonable doubt concerning entrapment, we also conclude that, on the evidence, a reasonable jury *could have had* a reasonable doubt concerning entrapment."). We have concluded that the sending of the $500 envelope was, by itself, not conclusive as to predisposition, and that the October 5, 2006 phone call arguably suggests there was none. The strongest evidence supporting a finding of predisposition concerns Theagene's conduct at the restaurant meetings, but those meetings occurred after the October 5 call, which we have concluded provided some evidence of government inducement. This evidence, in this chronological sequence, would permit a reasonable jury to conclude that the prosecution failed to prove criminal intent originated with Theagene rather than the government.

We therefore hold that Theagene made out a prima facie case of entrapment and was entitled have the jury consider his case with a proper instruction on that defense. It is undisputed that Theagene properly requested the entrapment instruction below, and that the defense, if credited by the jury, would preclude a guilty verdict. Accordingly, the trial court "err[ed] reversibly by not adequately charging the jury on the theory of entrapment." *See Gutierrez*, 343 F.3d at 419.

## IV. CONCLUSION

We conclude that on this record, Defendant-Appellant Theagene was entitled to a jury instruction on his entrapment defense. His conviction without that instruction cannot stand. He is therefore entitled to a new trial, which renders it unnecessary for us to consider his other points on appeal. We accordingly VACATE the conviction and REMAND for further proceedings consistent with this opinion.