# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10361

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

REYNALDO MACEDO-FLORES,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

June 3, 2015

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and KING and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

Reynaldo Macedo-Flores (Macedo) appeals his convictions for possession with intent to distribute 500 grams or more of cocaine and methamphetamines, obstruction of justice, and two counts of perjury. He challenges the district court's denial of his requested sentencing entrapment jury instruction, the sufficiency of the evidence regarding the materiality of his false statement supporting the perjury convictions, and the district court's admission of a lead police investigator's lay opinion testimony regarding Macedo's use of certain coded words. We AFFIRM.

No. 14-10361

I.

In January 2012, FBI Special Agent Miguel Torres (Agent Torres) and Dallas Police Department Detective Byron Boston (Detective Boston) obtained information from a cooperating defendant in a related case identifying Macedo as an alternate source of supply for methamphetamine and cocaine. Detective Boston, working undercover, began buying drugs from Macedo in February 2012. Detective Boston continued to purchase drugs from, and negotiate large drug purchases with, Macedo until July 16, 2013, when Macedo was arrested. Throughout the investigation, Detective Boston wore wire taps and relied on pole cameras, which recorded audio and video footage of many of the transactions between him and Macedo. After a few transactions with Macedo, Detective Boston indicated to Macedo that he wanted a half-kilogram of cocaine, and Macedo confirmed that he had access to that quantity and could deliver it.

In January 2013, when Detective Boston was still unable to determine Macedo's source for methamphetamine, he ordered four ounces of methamphetamine ice from Macedo in order to discuss a large cocaine order. Macedo told Detective Boston that his uncle had a "brick" of cocaine (1 kilogram) for $31,000. Macedo also told Detective Boston that he had a customer from San Angelo who purchased 32 ounces of methamphetamine weekly, stating that he was selling "life" quantities, meaning he would get a substantial prison sentence if caught with the quantities he was distributing. Based on this conversation and other information from the investigation, Detective Boston was able to obtain a warrant to tap Macedo's phone.

Detective Boston continued to discuss transactions with Macedo, hoping their interactions would trigger conversations between Macedo and his supplier or suppliers. Detective Boston then inquired about purchasing a half-

2

No. 14-10361

kilogram of cocaine, but Macedo refused and said he wanted to sell an entire kilogram. Investigators began listening to calls between Macedo and Jose Madrigal (Macedo's supplier for methamphetamine) and heard references to "la doña" and "la señora," the Spanish terms for "lady." For example, Macedo directed Madrigal to "drop the sweets"—referring to methamphetamine—"over there with the lady." In another call recorded on June 21, 2013, after Detective Boston had purchased methamphetamine from Macedo, Macedo told Madrigal that he wanted to take out $100 to give to "the lady," and Madrigal approved. Based on the fact that Macedo's mother had assisted in that transaction,[1] Detective Boston believed Macedo was asking to compensate Macedo's mother.

During a transaction that occurred on April 24, 2013, Macedo instructed Detective Boston to retrieve the drugs from a particular residence.[2] When Detective Boston arrived at the residence, a Hispanic female, who introduced herself as Berta, exited the rear of the residence. Detective Boston later learned that Berta (Austreberta Macedo) was Macedo's mother. Macedo's mother motioned for Detective Boston to remain quiet while they entered a shed at the rear of the residence, where she retrieved the methamphetamine ice from a cabinet drawer in the front portion of the shed. After receiving the drugs, Detective Boston conducted a field test to make sure the drugs were not fake, and Macedo's mother counted the money given in payment.

Macedo, Macedo's mother, and eight other individuals were subsequently indicted for multiple drug-trafficking offenses. Macedo's mother was tried individually in September 2013. During her trial, she called Macedo

---

[1] On April 24, 2013, Macedo negotiated the purchase of 4 ounces of methamphetamine with Detective Boston, but Macedo's mother completed the transaction by retrieving the drugs out of a cabinet in a shed behind her house.

[2] This transaction was captured on video.

No. 14-10361

as a witness. Macedo admitted to being a drug dealer "under pressure" but denied that his mother was a drug dealer. He said that she never conspired with him to sell drugs and denied that he had ever told her that the package she delivered to Detective Boston on April 24, 2013, contained drugs. Macedo testified that he told his mother that he needed her to deliver a package to a man and receive money from him. Macedo also testified that when he referenced "the lady" in the intercepted phone calls, he was not referring to his mother. Instead, he claimed that "la doña" and "la señora" were coded references to the house where his mother lived. Macedo also claimed that a reference to "la señora" in a different call—in which he informed Madrigal that "la señora" would be waiting for him—was a coded reference to a drawer or a box in the detached shed where Madrigal could leave the drugs. He admitted, however, that when he spoke to Madrigal about taking $100 for "the lady," he was referring to his mother.

## II.

Macedo was charged in a superseding indictment with one count of conspiracy to possess with intent to distribute more than 500 grams of cocaine, one count of conspiracy to possess with intent to distribute more than 500 grams of methamphetamine, one count of obstruction of justice, and two counts of perjury. The obstruction of justice and two perjury counts arose out of Macedo's testimony during his mother's trial. The indictment alleged that "[i]t was a material matter to [her] trial to determine whether or not [Macedo's mother] had knowingly participated in the conspiracy to distribute methamphetamine and aided and abetted the possession of methamphetamine with intent to distribute." The first count of perjury alleged that Macedo testified falsely when he stated that he directed his mother to give him the proceeds of the April 24, 2013, drug sale, and he gave them to Madrigal. The

4

second count of perjury alleged that Macedo testified falsely when he claimed that, by using the terms "la doña" and "la señora," he was referring to inanimate objects and not his mother.

At Macedo's trial, Detective Boston recounted the investigation into the drug conspiracy and the several transactions he participated in as part of that investigation. During direct examination, Detective Boston explained that a primary goal of the investigation was to identify the highest-level sources possible. On cross-examination, Macedo's attorney inquired about when investigators learned about Macedo's direct sources and when they developed sufficient evidence to bring a case against him. He also questioned Detective Boston to point out that Detective Boston set the quantities transacted. Detective Boston then confirmed that, although he believed that he had reached the highest source on the cocaine side of the investigation on July 2, 2013, he contacted Macedo another time to purchase cocaine. However, Detective Boston also testified that he continued transacting cocaine purchases from Macedo because although he had found one source, he had learned that Macedo had another source of supply for cocaine when his uncle, one of Macedo's cocaine suppliers, had none for sale.

The Government introduced several intercepted phone calls, and Agent Torres, the supervisor of the entire investigation, noted that Macedo referred to his mother as "la doña" or "la señora," Spanish terms that typically mean an older, respected woman. Macedo objected on the basis of "speculation" when Agent Torres asked how he knew the term "la doña" was not code for something other than a woman. The court conditionally overruled the objection, and Agent Torres explained that, based on the information learned during the investigation, he believed Macedo was referring to his mother. When asked to explain his understanding of what Macedo meant when he asked Madrigal to

take out $100 to give to "the lady," Agent Torres explained that he believed Macedo was talking about giving money to his mother.  This explanation was also made over a speculation objection.

Agent Torres also testified about recorded conversations between Macedo and his sister, Reyna, while Macedo was in pretrial detention.  Reyna implored Macedo to do whatever he could to help their mother and to "make your statements" to help her.  She told Macedo that "[y]ou have to say that it's all yours."

Jose Madrigal also testified at Macedo's trial.  Among other things, Madrigal confirmed that he delivered the methamphetamine for the April 24, 2013, sale to Macedo's mother and picked up the proceeds from her.  He also listened to recorded calls and testified that he understood Macedo to be referring to his mother when he used the terms "la doña" or "la señora." Madrigal also confirmed that he understood Macedo to be talking about his mother when he asked whether he could take $100 from the drug proceeds.

Prior to trial, Macedo requested that the jury be instructed on "sentencing entrapment."  He sought the following instruction:

> Defendant Reynaldo Macedo-Flores also argues that he was specifically entrapped as to the quantity of the drugs involved in the government's alleged conspiracy. You must decide whether Defendant Macedo-Flores had the intent to distribute the charged quantity of the controlled substance, which the conspiracy counts is at least 500 grams of cocaine and 500 grams of methamphetamine. You must also decide whether the government inflated the quantity of drugs to make Macedo-Flores's punishment more severe. Finally, if you find that Defendant Macedo-Flores was specifically entrapped as to the quantity of drugs involved, you must decide what quantity (and specific count in the indictment) was not a result of that entrapment.

During the jury charge conference at trial, Macedo argued that he was entitled to his requested sentencing entrapment instruction, relying on unpublished Ninth Circuit precedent recognizing the defense. *See United States v. Allen*, 242 F. App'x 425 (9th Cir. 2007). According to Macedo's attorney, *Allen* recognized that sentencing entrapment was a viable defense where a defendant proves that either: (a) the Government improperly influenced the amount of drugs involved in the conspiracy, or (b) the Government led the defendant to sell more drugs than he was predisposed to sell. Macedo's counsel acknowledged that "I don't think we can argue that second prong, Mr. Macedo was predisposed to sell those quantities." He added, however, that "we do think we have ample evidence in the record that the Government inflated the amount of drugs that . . . Mr. Macedo is responsible for." He contended that certain sales were transacted "for no reason or purpose" and that "the only reason [the Government transacted additional amounts] was to jack up [Macedo's] potential sentence and to jack up, I guess, the threshold." After "wrestling" with the issue and considering relevant authority, the court declined to give the requested instruction.

The jury convicted Macedo on all counts. At sentencing, the court determined that Macedo's Guidelines range was a life term, but it varied downward to 300 months. In doing so, the court specifically addressed Macedo's objection based on the sentencing enhancement:

> I believe that based upon the evidence presented at the trial, the law enforcement methods used in this case were legitimate and in an attempt to determine the scope of the conspiracy, find other conspirators and other sources of supplies, and that it was appropriate to do so.

The court considered the Guidelines but stated that its chosen non-guidelines sentence was appropriate after considering the 18 U.S.C. § 3553(a) factors.

No. 14-10361

Therefore, the court remarked that it was the same sentence it would have imposed even if it was incorrect on any of the Guidelines objections Macedo filed.

Macedo now makes three challenges to his conviction and sentence. We address each challenge in turn.

III.

A.

First, Macedo argues that the evidence warranted a sentencing entrapment defense jury instruction as to both drug trafficking counts because a "reasonable jury could have determined that [the undercover agent's] cocaine purchases in and after March 2013 were undertaken to inflate" the drug quantity. Because this circuit does not recognize such a defense nor does Macedo prove true entrapment, we AFFIRM the district court's denial to instruct the jury on sentencing entrapment.

We review the district court's refusal to give a requested jury instruction for an abuse of discretion. *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998) (citation omitted). This court will only reverse the district court for refusal to give a requested instruction "if the proposed instruction was (1) substantively correct, (2) not substantively covered in the jury charge, and (3) concerned an important issue in the trial, such that failure to give the requested instruction seriously impaired the presentation of a defense." *Id.*

As noted by both parties, this court has never recognized sentencing entrapment as a defense,[3] but we have consistently noted that, were we to

---

[3] Despite several sister circuits' adoption of this defense, this circuit has yet to explicitly recognize the defense of sentence entrapment. *See Stephens*, 717 F.3d 440, 446 (5th Cir. 2013) ("We have never recognized sentencing entrapment as a defense."); *see also United States v. Alvarez*, 575 F. App'x 522, 528 (5th Cir. 2014) ("[T]his court does not recognize . . . 'sentencing entrapment' in any context."); *United States v. Jones*, 664 F.3d 966, 984 (5th Cir.

accept the defense, it would only be cognizable in cases involving "true entrapment," *United States v. Tremelling,* 43 F.3d 148, 152 (5th Cir. 1995) (citation omitted), or where there is proof of "overbearing and outrageous conduct" on the Government's part. *Stephens*, 717 F.3d at 446.

In order to establish the defense of true entrapment, "a defendant must make a prima facie showing of (1) his lack of disposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity to commit the offense." *Id.* at 444 (internal quotation marks and citation omitted); *see also United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997) ("The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with the government agents." (citations omitted)). In examining a defendant's predisposition to commit the offense, the court is to look at, *inter alia*, (1) the defendant's "eagerness to participate in the transaction," and (2) the defendant's "ready response to the government's inducement offer." *United States v. Chavez*, 119 F.3d 342, 346 (5th Cir. 1997) (internal quotation marks and citation omitted). Further, "[p]redisposition . . . focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (quoting *Sherman v. United States*, 356 U.S. 369, 372 (1958)). This court has previously held that "[a] lack of predisposition can appear from, for example, lack of prior interest or

---

2011) ("[T]his Court apparently has not expressly determined whether we have accepted the concept of sentencing factor manipulation."); *United States v. Snow*, 309 F.3d 294, 295 (5th Cir. 2002) ("This court has not had to determine whether sentencing entrapment is a cognizable defense to a sentence."). Almost all of our sister circuits have opined about both sentencing entrapment and sentencing factor manipulating, reaching varied conclusions. *See United States v. Sed*, 601 F.3d 224, 229–30 (3d Cir. 2010) (collecting cases).

experience related to the crime, significant hesitation or unwillingness, or attempts to return discussion to lawful conduct." *United States v. Theagene*, 565 F.3d 911, 920 (5th Cir. 2009). Where a defendant "promptly avail[s] himself of [a] criminal opportunity, it is unlikely that his entrapment defense . . . [warrants] a jury instruction." *Jacobson*, 503 U.S. 540, 550 (1992).

Only after the defendant has made a prima facie showing of entrapment by showing both elements—lack of predisposition and governmental inducement—is the defendant entitled to an entrapment instruction by the court. *See Stephens*, 717 F.3d at 444. If the defendant can make this prima facie showing, he shifts the burden "to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the offense before the government first approached him." *Theagene*, 565 F.3d at 918.

Macedo has failed to make a prima facie showing of true entrapment, and as such, the district court did not abuse its discretion by denying his requested jury instruction.  First, Macedo has failed to prove that he was not already predisposed to selling drugs prior to his interactions with Detective Boston.  In a similar case involving a paid informant, this court held that a defendant who "readily agreed to arrange a drug deal" and "demonstrated knowledge of his role as a broker during the drug transaction" was not entitled to an entrapment defense.  *Chavez*, 119 F.3d at 345–46; *see also United States v. Gilmore*, 590 F. App'x 390, 395–96 (5th Cir. 2014) (looking to the attitude of the defendant and stating that "[e]vidence of predisposition can include . . . active, enthusiastic participation or demonstrated expertise in the criminal endeavor.")  In the instant case, there is more than enough evidence that a jury could reasonably infer that Macedo was predisposed to selling drugs and to selling large quantities of drugs.  Not only did Macedo's counsel concede that "Macedo was predisposed to sell those quantities," but Macedo never hesitated

when negotiating the drug purchases with Detective Boston, no matter the quantity. *See Gilmore*, 590 F. App'x at 396.

Second, Macedo has also failed to show governmental involvement and inducement more substantial than simply providing an opportunity to commit the offense. *See Bradfield*, 113 F.3d at 521. "Inducement . . . appear[s] when government agents persist in encouraging criminality after a defendant rejects overtures." *Theagene*, 565 F.3d at 922. In *Bradfield*, police paid a confidential informant a contingency fee to successfully induce Bradfield to participate in a drug deal. 113 F.3d at 518, 523. The informant made "approximately eighteen calls during April 1992, in an unrelenting campaign to entice Bradfield to do a drug deal." *Id.* at 523. In that case, this court concluded that there was "a plethora of evidence of government inducement[,]" which was "more than sufficient to establish a prima facie showing [of inducement]." *Id.* at 523–24. In *Jacobson*, government agents repeatedly sent the defendant personalized correspondence and fake advertisements to encourage him to order child pornography materials. *Jacobson*, 503 U.S. at 546–47. Initially the defendant only expressed interest in adult pornography, but after two years of the government's propositions, he placed an order for child pornography. The Government argued that he was predisposed to commit the crime, but "[did] not dispute that it induced [defendant] to commit the crime." *Id.* at 549 n.2.

In the instant case, unlike the defendants in *Bradfield* or *Jacobson*, Macedo was not subject to the Government's substantial inducement. To the contrary, Detective Boston simply initiated routine drug deals with Macedo, who, without hesitation, consummated several purchases in varying amounts. Further, Detective Boston never coaxed or persuaded Macedo into these drug deals; Macedo was a willing participant. *Cf. Bradfield*, 113 F.3d at 521, 523–24. Macedo argues that although he might have been predisposed to selling

No. 14-10361

large amounts of drugs, the cocaine purchases in and after March 2013 were undertaken to inflate the scope of the conspiracy in terms of drug quantity. The Government concedes that Macedo's attorney did in fact show that "(1) the lead agent was generally aware that a defendant who was involved with a higher volume of drugs is subject to a higher sentence, and (2) agents continued to make purchases through Macedo even after they could have arrested him and after they had identified his immediate suppliers." However, the law enforcement officers continued to conduct transactions with Macedo for the purposes of identifying his suppliers, triggering activity with suppliers further upstream, developing probable cause for other investigative measures, or maintaining the detective's relationship with Macedo.[4]

There is instead "a plethora of evidence" refuting Macedo's arguments of government inducement, not only to sell the drugs but to sell the greater quantities. *Cf. Bradfield*, 113 F.3d at 521, 523–24. Macedo has not proven that the Government induced him to sell drugs generally, nor has he proven that the Government induced him to sell larger quantities of drugs than what he was already predisposed to sell. Thus, the district court did not abuse its discretion in denying Macedo's requested sentence entrapment jury instruction.

B.

Second, Macedo argues that although the Government introduced adequate evidence of the falsity of his testimony during his mother's trial, it made little or no effort to show its materiality. We disagree.

---

[4] Macedo was the Government's only contact in the conspiracy. In fact, when the Government saw an opportunity to bypass Macedo and possibly deal directly with his supplier, their effort to seize on that opportunity was unsuccessful.

No. 14-10361

When weighing the sufficiency of the evidence, this court "reviews the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc).

Perjury is defined as "knowingly mak[ing] any false material declaration" to any court or grand jury. 18 U.S.C. § 1623(a). The declaration must be "material to the point in question." *Id.* Materiality under § 1623 requires only that the defendant's statements had "a natural tendency to influence, or [were] capable of influencing, the decision of the decisionmaking body to which it is addressed." *United States v. Brown*, 459 F.3d 509, 529 (5th Cir. 2006) (internal quotation marks and citations omitted). "The Government does not have to demonstrate that the grand jury was *actually* hindered in any way by the falsehood." *Id.* (alteration in original). If the false statement was capable of influencing the jury, it is material. *See United States v. Jimenez*, 593 F.3d 391, 400 (5th Cir. 2010). Further, "the statements need not be material to any [p]articular issue but may be material to any proper matter of inquiry." *United States v. Cuesta*, 597 F.2d 903, 921 (5th Cir. 1979) (citing *United States v. Abrams*, 568 F.2d 411, 420 (5th Cir. 1978)).

Count Four of the superseding indictment charged Macedo with committing perjury during his mother's trial. That count specifically alleged that Macedo's mother's intent—i.e., whether she knowingly participated in the conspiracy—was a material issue and that Macedo testified falsely when he said that he received the proceeds from a methamphetamine sale from his mother and gave it to his supplier. In truth, Macedo's mother gave the money directly to Madrigal, the meth supplier, after her transaction with Detective

13

No. 14-10361

Boston.  Macedo concedes that the Government proved that this testimony in his mother's trial was false.  However, he argues that this evidence fails to support his perjury conviction because the Government did not instruct Macedo's jury that the prior false testimony was material in his mother's trial.

Macedo cites to *United States v. Damato*, 554 F.2d 1371 (5th Cir. 1977), a case where the Government introduced ample evidence of the falsity of the defendant's testimony during a suppression hearing.  *Id*. at 1372.  Because the defendant's false testimony was "only a small portion of the entire record made at the hearing and [did] not reflect the issues that the motions to suppress raised," this court held that the Government's proof of materiality was insufficient.  *Id*. at 1373.  More specifically, the court held that the record before the trier of fact must do more than "[hint] at the relationship between [the defendant's] statements and the [prior proceeding]."  *Id*. at 1372.  Macedo's reliance on *Damato* is misplaced.  In that case, the materiality of the false testimony was inadequate because the Government never informed the jury on what issues were raised by the suppression motions.  *Id*. at 1373.  Thus, even if the jury could find that the defendant's testimony was false, it did not know what issues were before the court weighing the suppression motion and therefore had no way of knowing how the false testimony related to those issues.

By contrast, when a defendant's false statements related to whether he "had knowledge of" certain aspects of the investigation and criminal activity and the jury was aware of those issues, this court held that the false statements were material.  *Cuesta*, 597 F.2d at 921.  The defendant in *Cuesta* testified that he had never told a co-defendant that someone would kill the victim for being a government informant and implicating the defendant in the criminal activity.  *Id*. at 910–11.  However, the Government had proof of the falsity of

14

the statement from a taped conversation between the co-defendants. *Id.* Because the false statement was "capable of influencing the [] jury" as to whether the defendant had knowledge of the illegal activities, this court held that the statement was material. *Id.*

The instant case is more analogous to *Cuesta*, as the jury in Macedo's trial was well aware that the primary issue in his mother's trial was whether she was a knowing participant in the drug conspiracy. *See id.* His false testimony on the record—that his mother never conspired with him to sell drugs and that he never told her that the package she delivered to Detective Boston on April 24, 2013, contained drugs—did not just "hint at the relationship" between his statements and the issues before his mother's jury. *See Damato*, 554 F.2d at 1372. Instead, Macedo's false testimony was directly related to the critical issue of whether his mother was a knowing participant in the drug transactions, and the jury was well aware of that. *See Cuesta*, 597 F.2d at 921. Thus, it is almost without question that this false testimony was capable of influencing the jury. *See Jimenez*, 593 F.3d at 400.

As such, viewing the evidence in the light most favorable to the Government, there was sufficient evidence that Macedo's false statements were material to the issue of his mother's knowing participation in the drug conspiracy.

C.

Third, Macedo argues that the Government agent's lay opinion testimony regarding the meaning of certain coded words should not have been admitted because the agent possessed no special familiarity with the meaning of the recorded language nor was he was a participant in the recorded conversations at issue. We disagree.

15

No. 14-10361

We review the district court's evidentiary rulings for abuse of discretion, subject to a harmless error analysis. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011).  A reversal is not warranted unless the defendant shows "that the district court's ruling caused him substantial prejudice." *United States v. El-Mezain*, 664 F.3d 467, 494 (5th Cir. 2011) (internal quotation marks and citation omitted), *as revised* (Dec. 27, 2011); *see* Fed. R. Evid. 103(a).

Lay opinion testimony is limited to the witness's opinion and must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; *see also United States v. Akins*, 746 F.3d 590, 598–99 (5th Cir. 2014).  Further, "[t]his Court has recognized that in the context of drug conspiracies, [d]rug traffickers' jargon is . . . a fit subject for expert testimony.  [However,] we have recognized that testimony about the meaning of drug code words can be within the proper ambit of a lay witness with extensive involvement in the underlying investigation." *Akins*, 746 F.3d at 599 (5th Cir. 2014) (internal quotation marks and citation omitted, and alterations in original).

Several cases in this circuit have addressed similar factual scenarios where an agent in a drug conspiracy investigation testified as to his understanding of the meaning of slang or code words used in wiretapped conversations.  *See Akins*, 746 F.3d at 598–600; *El–Mezain,* 664 F.3d at 514; *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001).  In *Akins*, the lead investigator on a drug conspiracy investigation testified at trial as a lay opinion witness about "his understanding of the meanings of various code words used in recorded wiretapped conversations."  746 F.3d at 597.  He testified that the meanings he ascribed to the code words were gleaned from "the course of the

16

investigation as well as his career experience." *Id*. This court held that the district court did not abuse its discretion in permitting the testimony. *Id*. at 599–600. It further held that "[t]o the extent that certain portions of [the investigator's] testimony . . . crossed the line into drawing exclusively on his expertise, it was cumulative of other testimony [in the record] and therefore harmless." *Id*. at 600.

Similarly in *El–Mezain,* two agents were extensively involved in the investigation of a conspiracy and testified to their understanding of the events in that case. 664 F.3d at 514. This court held that "[t]estimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation." *Id*. Also, in *Miranda,* the Appellant claimed that an FBI agent, who had not been designated as an expert witness, testified to the meanings of various code words heard on intercepted phone calls and thereby "'crossed the line' from lay to expert opinion testimony." 248 F.3d at 441 (internal citation omitted). In rejecting that argument, this court again held that the agent's testimony was permissible under Federal Rule of Evidence 701 because the agent's "extensive participation in the investigation of this conspiracy, including surveillance . . . and the monitoring and translating of intercepted telephone conversations, allowed him to form opinions concerning the meaning of certain code words used in this drug ring based on his personal perceptions." *Id*. at 441.

Although Agent Torres's experience as a law enforcement officer may have allowed him to testify as an expert, our case law also allows him to testify to his lay opinion regarding the meaning of code words used in an investigation for which he is the lead investigator. *See Akin,* 746 F.3d at 598–600; *El-Mezain,* 664 F.3d at 514; *Miranda,* 248 F.3d at 441. Analogous to the agents

in the case law, Agent Torres was the lead investigator on this drug conspiracy. A native Spanish speaker, Agent Torres oversaw "the entire investigation from beginning to end" and testified that his duties "in the case [included] listening and just being up-to-date on all the wire interception phone calls." His opinion about what Macedo meant when he used the terms "la doña" and "la señora"—both Spanish terms for "lady"—was based on his substantial involvement in the investigation of the drug conspiracy. The district court permitted Agent Torres's testimony based on his training and experience generally, but Agent Torres clarified that his opinion was based on his experience in this particular investigation.

Attempting to distinguish this case, Macedo cites to *United States v. Ebron*, 683 F.3d 105, 137 (5th Cir. 2012), which held that "[a] lay opinion must be based on personal perception . . . and must be helpful to the jury." He argues that Agent Torres's testimony was not helpful because Torres "ha[d] no more insight into [the] meaning [of the code words] than the jury." He also argues that this court has never allowed an officer to testify that language was not coded. First, *Ebron* actually bolsters the Government's position, as Agent Torres's perceptions of the meaning of the Spanish words for lady likely help the jury to decide whether Macedo's mother was a participant in the drug conspiracy. *See* 683 F.3d at 137. Second, Agent Torres had much more insight into the meaning of the code words than did the jury. Not only is he a native Spanish speaker, but he oversaw the entire investigation and listened to all of the intercepted phone calls. This gives him a unique perspective and insight into the conspiracy from which the jury could benefit. Thus, his opinion was likely helpful to the jury's understanding of the case. Third, Macedo's argument that this court has never allowed an officer to testify that language was not coded is a conflated statement of the issue. Whether the agent testifies

to the true meaning of coded words or instead testifies that such "coded" words are to be given their ordinary meaning makes no difference. Either way, the case law forecloses the argument. As such, the district court did not abuse its discretion in admitting Agent Torres's lay opinion testimony regarding the meaning of "la doña" and "la señora."

## D.

Further, any error by the district court was harmless. Agent Torres's testimony, like that of the agent in *Akins*, did not have a substantial and injurious effect on the jury's verdict, as there was ample other testimony translating the terms as referring to an older, respected woman—more specifically, Macedo's mother—from an FBI linguist, Detective Boston, Madrigal (a co-defendant), and even Macedo himself. *See Akins*, 746 F.3d at 599–600 (holding that the admission of an agent's testimony was harmless in light of its consistency with testimony by other agents and a co-conspirator). Thus, the admission of Agent Torres's opinion was also harmless, and we AFFIRM.

## IV.

We AFFIRM the district court.